## UNITED STATES v. HALL.

*(District Court, S. D. Georgia, W. D.* November 21, 1890.)

1. PERJURY—WHAT CONSTITUTES.

Where a *subpœna duces tecum* has been issued to a witness, requiring him to produce a deed therein described, and he answers orally under oath before the court that he had no such deed, and never had it, and it further appears that the deed he was required to produce was alleged to have been furnished him by the prisoner, if, on the trial of a traverse to the answer made by the respondent to the *subpœna duces tecum*, the prisoner testified that he had furnished or delivered the respondent no such deed, his testimony would be in a matter material to the issue so formed, and, if he testified falsely, not believing his testimony to be true, he would be guilty of perjury.

2. SAME—EVIDENCE.

Before the jury are authorized to convict the defendant on a charge of perjury, they must be satisfied from the testimony of one witness, with corroborating circumstances, or from the testimony of more than one witness, that the prisoner swore and testified falsely, not believing his testimony to be true.

**3.** SAME.

The evidence must be something more than sufficient to counterbalance the oath of the prisoner and the legal presumption of his innocence. The oath of the accusing witness, therefore, will not avail to convict, unless it be strongly corroborated by other independent circumstances; but the jury will be justified in convicting upon the testimony of a single credible witness so corroborated.

**4.** SAME—CORROBORATION.

In a case of perjury, every material allegation in the indictment may be shown by a single witness except the allegation that the evidence of the prisoner in question was false, and that he did not believe it to be true. The deed in question being a forgery, it is material to show, as a circumstance of corroboration of the testimony of the accusing witness, that it was in the handwriting of the prisoner, that the latter was extensively engaged in forging, and causing to be forged, deeds to lands in that portion of the state.

**5.** CREDIBILITY OF WITNESS.

The question whether a witness is impeached or not is for the jury to answer, and, though he swore differently on a former trial, if this was done under duress of bodily harm, it may not affect his testimony.

**6.** SAME—IMPEACHMENT.

Where the law obliges a party to call a witness, the party calling him is not precluded from proving the truthfulness of any particular fact by any other competent testimony in direct contradiction to what such witness may have testified, and this is not only where it appears that the witness was intentionally mistaken, but even where the evidence may collaterally have the effect of showing that he was generally unworthy of belief.

**7.** TRIAL—INSTRUCTIONS.

Power of judges in the federal courts to sum up the evidence discussed, but declared merely advisory, and not intended to fetter the exercise of the independent judgment of the jury. It is the right and duty of the court to aid the jury "to recall the testimony to their recollection by collating its details, by suggesting grounds of preference where there is contradiction, by directing their attention to the most important facts, by eliminating true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts, and their combined effect, stripped of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important rests upon those who preside at jury trials. Constituted as juries are, it is frequently impossible for them to discharge their functions wisely and well without this aid. In such cases chance, mistake, or caprice may determine the result." *Nudd* v. *Burrows*, 91 U. S. 439.

**8.** SAME—ARGUMENTS OF COUNSEL.

Duty of the jury to discard improper and misleading appeals, adverted to.

*(Syllabus by the Court.)*

Indictment for Perjury.

*John L. Hardeman,* Special Asst. U. S. Atty.

*Bacon & Rutherford* and *Dessau & Bartlett,* for defendant.

SPEER, J., *(charging jury.)* The laws of the United States provide that every person who, having been sworn conformably to law that he will testify truly, does, willfully, and contrary to such oath, state any material matter which he does not believe to be true, he shall be held guilty of perjury, and, on conviction, shall be punished therefor. The prisoner, Luther A. Hall, has been indicted for an alleged violation of this law. To that indictment he has pleaded not guilty, and thus the charge preferred by the grand jury, with his plea thereon, presents for your determination, under the rules of law, the issue now on trial. The crime of perjury is a crime against public justice. It is a fundamental principle in all judicial investigations—that is, in all trials before the courts—that in the ascertainment of the truth of the matter in controversy society must rely upon the respect and obligation which the

solemn oath, administered in accordance with law, will have in the mind and conscience of the witness. This crime was not originally punishable by, the courts of law. It was deemed in the ages past a sin, rather than a crime, and its punishment was supposed to reside with the offended Deity, who had been solemnly invoked, and the solemn invocation to whom had been disregarded. But for several centuries past the crime has been triable and punishable in the courts, and the statute which the prisoner at the bar is charged to have violated was enacted immediately after the organization of our government, to-wit, in the year 1790. I am sure that all the occurrences of this lengthy trial have given to you, if you did not possess it in its outset, an adequate impression of the importance and gravity of the accusation, as well to the prisoner as to the community. It was well said to the Athenians, by the orator Lycurgus that no country can subsist a twelve-month where an oath is not thought binding, for the want of it must necessarily dissolve society. I allude to the gravity of the offense with which the prisoner stands charged, not to justify or arouse any undue anxiety or excitement in your minds, but to make you, if I can, thoroughly appreciate the magnitude of the issue on trial as it may affect the prisoner, and society as well. While I invoke your anxious and impartial attention to the entire case as it has been and will be submitted, I caution you against confusing the question of guilt or innocence with the magnitude of the charge, or its consequences to any, or to all. You will be careful, gentlemen, to observe the several elements necessary to constitute the crime of perjury. First, the oath must have been taken before a tribunal competent to administer the same, and in a case in which the law of the United States authorizes an oath to be administered. The oath must be that the person taking it will testify truly. Having been so sworn, the person testifying must willfully, and contrary to his oath, state or testify to a material matter which he does not believe to be true. By the language "material matter" is meant evidence or testimony material to the issue then on trial. In such case, a person so lawfully sworn, who willfully, and contrary to his oath, states or subscribes any material matter which he does not believe to be true, is guilty of perjury. Now, let us first inquire whether, in the case before the court, the government has shown to the jury that the prisoner, Luther A. Hall, has been placed, by his conduct, in the attitude, in which we may rightfully inquire whether his testimony, about which the trial is had, was false, and not believed by him to be true. It is charged in the indictment that he was sworn as a witness on the trial of the traverse to an answer made by one Judge Goodwin to a *subpœna duces tecum;* that the trial was had upon the hearing of a rule brought by Norman W. Dodge against Luther A. Hall for an alleged violation and contempt of a decree of the circuit court of the United States for this district. It is further charged in the indictment that the oath was taken before the judge of this court, who was then presiding in said circuit court. Now, gentlemen, I charge you, as a matter of law, that the circuit court of the United States for this district and circuit is a tribunal competent to administer an oath; that the judge

of this court has lawful power and authority to preside in the said circuit court of the United States, and had such authority at the time referred to in the bill of indictment, and on the trial of the proceeding therein described, between Norman W. Dodge and Luther A. Hall. I charge you further that, in hearing the answer of a witness to a *subpœna duces tecum*, and on the trial of a traverse to such answer, there is before the court a case, in which a law of the United States authorizes an oath to be administered. I charge you further that, if you believe from the evidence that the prisoner, at the time and on the issue described in the indictment, was sworn in the usual manner, the method of administering the oath is a sufficient compliance with the law. I charge you further, if you find from the evidence that a *subpœna duces tecum* was issued to one Judge Goodwin, requiring him to produce a deed therein described before the court, on a day certain, and he answered that he had no such deed, and it further appears from the evidence that the deed he was required to produce was alleged to have been furnished him by the prisoner; and if it further appears that on the trial of the traverse to the said answer, that the party taking out the subpœna insisted, by evidence and otherwise, that the deed sought to be produced was furnished Goodwin by the prisoner, if then the prisoner testified that he had furnished or delivered Goodwin no such deed, his testimony on the occasion described would be in a matter material to the issue. It follows, therefore, that if, on the trial of a traverse to the answer made to a *subpœna duces tecum* issued in the proceeding and manner described in the indictment, the defendant testified, after having been sworn, it will then be the duty of the jury to ascertain whether it be true, as charged in the indictment, that the prisoner testified, and, if he testified, whether he testified falsely, not believing his testimony to be true. Did the prisoner testify? To ascertain this you will look to the testimony. A stenographer, Mr. Richter, who took the testimony in short-hand, testified as follows:

"I took the testimony of all the witnesses introduced, with the exception of the first two or three. I took the testimony of Mr. Hall. *Question.* Did you take the testimony on the hearing of the *subpœna duces tecum* against Judge Goodwin? *Answer.* Yes, sir. *Q.* Did you take the testimony of Mr. Hall on that proceeding? *A.* Yes, sir. *Q.* Just state to the court whether you recall that testimony, so as to give it, or whether you have your notes. *A.* I have my notes. *Q.* Can you read those notes? *A.* Yes, sir."

The witness reads from his notes taken on the trial of the traverse to Goodwin's answer.

"Luther A. Hall sworn. Direct examination by Mr. Erwin: Mr. Hall, state whether or not you ever furnished a deed answering to the description in this subpœna issued to Judge Goodwin. *Answer.* I never did. *Question.* State whether or not you ever witnessed a deed as notary public from any one to Judge Goodwin. *A.* No, sir. *Q.* To the two lots 286 & 315? *A.* No, sir; and no man has ever seen any such deed in his possession. I know that I never delivered him any, never witnessed any, and never had any land transactions with him whatever, and any statement to the contrary is false."

The witness L. M. Erwin in substance testified as did the witness Richter; and in fact it is agreed by counsel for the prosecution and for the defense that the transcript from the notes of the witness Richter, taken on the hearing before the circuit court, is substantially a correct recital of the testimony then given. You may therefore conclude that the prisoner, after being duly sworn before a competent tribunal to testify truly, did, in a case where, by a law of the United States, it was authorized to administer the oath, testify to a matter material to the issue, and the question remains for your decision, did he, as the indictment charges, testify willfully and falsely to what he did not believe to be true? If he did, he is guilty of perjury. If he did not, or if you have a reasonable doubt, which I shall presently define to you, whether he did or not, he should be acquitted.

In all trials for perjury it is a rule of evidence, founded upon obvious reasons, that the testimony of a single witness is not sufficient to convict. There must be corroboration of his evidence in some material particular, either by the testimony of another witness, or other witnesses, or by other evidence of a documentary or circumstantial character, which possesses a sufficient corroborative effect. This rule is founded on substantial justice, because, if the testimony of the prisoner upon which perjury is assigned were opposed by the testimony of a single witness, it would be merely oath against oath. It is not true, however, that two witnesses are essentially requisite to disprove the particular fact sworn to; for, if any material circumstance, such as the defendant's own letters and declarations, be proved most clearly by other witnesses in confirmation of the witness who gives the direct testimony to show the perjury, such material circumstance may turn the scale and warrant a conviction. It is not necessary, moreover, that every fact which goes to make up the assignment of perjury should be disproved by two witnesses, for the testimony of a single witness is sufficient to prove that the defendant swore as is alleged in the indictment; and there have been cases where living witnesses were dispensed with altogether, in a prosecution for perjury, as in a case where the false swearing is directly disproved by documentary or written testimony, springing directly from the defendant, with circumstances showing his corrupt intent. In the case at bar, however, before you can convict the defendant, you must be satisfied, from the testimony of one witness, with corroborating circumstances, or from the testimony of more than one witness, that the prisoner swore and testified falsely, not believing his testimony to be true, and in the manner as charged in the indictment. It was formerly the law that two witnesses were necessary to show the crime of perjury, but this rule has long since been modified. The rule now is that the evidence must be something more than sufficient to counterbalance the oath of the prisoner, and the legal presumption of his innocence. The oath of the accusing witness, therefore, will not avail to convict unless it be corroborated by other independent circumstances. But, gentlemen, it is not correct to say that these additional circumstances must necessarily be equal to the testimony of another witness. The oath of the prisoner rel-

ative to which the charge of perjury is made is given the effect of that of the testimony of a credible witness. If, therefore, another credible witness is opposed in his testimony to the oath of the prisoner, the scale of evidence will be exactly balanced, and this equilibrium or evenness in the testimony must be destroyed by material and independent evidence before the party can be convicted. This additional evidence, whether proceeding from letters or documents, or any evidence of other circumstances, is not required to be so strong that, standing alone, it would justify a conviction; but it must be at least strongly corroborative of the testimony of the accusing witness. Now, gentlemen, to apply this rule to the facts of this case. If you should believe from the evidence that a credible witness, as introduced by the government,—we will say, for illustration, Mr. Charles H. Peacock,—has satisfactorily shown to you that the deed in controversy in this case was in the possession of Judge Goodwin, and was in the handwriting of Luther A. Hall, with such circumstances as would justify you in crediting that witness, although you might credit it, this would not justify you in convicting the prisoner, unless there were other circumstances material which had the effect to corroborate the testimony of Mr. Peacock. The term "corroborate the accusing witness" means to make strong; to strengthen; to support; to tend to establish the truth of the statement of the accusing witness. If, therefore, you find in the evidence other independent circumstances in addition to the testimony of a credible accusing witness, which circumstances are material to the issue,—that is, relate to and throw light on the question whether or not the deed mentioned in the indictment was made and delivered as charged,—if these circumstances are sufficient to strengthen, to establish, and support the truth of the testimony of the accusing witness, you would be justified in convicting the defendant on the testimony of the single accusing witness so corroborated. Moreover, gentlemen, it is not true as insisted that the testimony of the single accusing witness in a charge of perjury stands upon the same footing as the testimony of an accomplice. There is a decided difference in principle in the rule where any credible witness testifies and where a participant in crime —in other words, an accomplice—testifies. The conditions are entirely different. An accomplice, who is a criminal because of his crime, while not incompetent, is discredited, generally, unless his testimony is confirmed so as to show its truth. The testimony of a single accusing witness in a case of perjury is not discredited by the law, but is merely, upon principles of common justice, held to be balanced by the oath of the prisoner. The corroborating circumstances in the case of an accomplice must confirmatively show the truth of his evidence. The corroborating circumstances to the testimony of a single accusing witness in a case of perjury, in the language of Mr. Greenleaf in his famous work on Evidence, must be sufficient to destroy the equilibrium between the testimony of that witness and the oath of the prisoner. It is true, also, that in a case of perjury every material allegation in the indictment may be shown by a single witness, except the allegation that the evidence of the prisoner in question was false, and that he did not believe it

to. be true. This, however, must be shown by two witnesses, or by one witness with circumstances of satisfactory corroboration. Now, what is the testimony of Mr. C. H. Peacock, the witness whom the government insists is a credible accusing witness? You remember the testimony of the prisoner, L. A. Hall. I will now read you, from the transcript of the stenographic report in this case, a portion of the testimony of Peacock on his direct examination:

" "Mr. C. H. Peacock, recalled. *Mr. Hardeman.* Where do you reside, Mr. Peacock? *Answer.* In Eastman. *Question.* How long have you lived there? *A.* 14 years. *Q.* What is your occupation? *A.* I am merchandising, farming, and in the naval store business. *Q.* Previous to your entering that business, were you in any other? *A.* I have been merchandising, sir, for 14 years. *Q.* Have you ever held any other position there? *A.* Yes, sir; I was county treasurer for six years. *Q.* Any other office? (Objections of counsel.) *Q.* Was there any other position you held there? *A.* I was treasurer of the town council for one year. *Q.* Any other? *A.* I was assistant postmaster for 3 years, I think, sir, and 5 months. *Q.* What opportunities have you had for becoming acquainted with the handwriting of Luther A. Hall? *A.* I have seen a great many notices that he wrote, and seen a great deal of his handwriting, and seen deeds that he wrote; seen applications he made for money orders. *Q.* Do you know Judge Goodwin? *A.* Yes, sir. *Q.* Just state whether or not you ever saw any deed in his possession to certain lots of land. *A.* I have seen it. *Q.* What lots were those? *A.* 286 & 315. *Q.* What district were those two lots in? *A.* 16th, is my recollection. *Q.* What county? *A.* Dodge county. *Q.* Who was the grantee in that deed, —to whom was it made? *A.* Judge Goodwin. *Q.* By whom did it purport to be signed? *A.* William Sullivan. *Q.* Who is William Sullivan,—do you know him? *A.* No, sir; I don't. *Q.* What names were signed as witnesses to that deed? *A.* John D. Smith and L. A. Hall, notary public of Dodge county. *Q.* In whose handwriting was that deed made? *A.* I recognized it as Col. Hall's handwriting. *Q.* When was it that Judge Goodwin showed you this deed? *A.* Some time in the early part of the year, April or May. *Q.* Which May? *A.* This year, 1890. It was prior to the time we came up here this summer. *Q.* Was that a written deed or not? *A.* It was a printed form, and filled out, sir. *Q.* I will ask you if there was anything that you noticed about that blank? *A.* Yes, sir. *Q.* What was it? *A.* In reading the deed I saw it was from William Sullivan, and I then turned and saw— I wanted to see—the county that Sullivan lived in, but the county was blank. *Q.* Anything about the blank itself? *A.* Yes, sir; I noticed on the margin of the deed it was the 'Times Journal Printing Company.' *Q.* I will ask you to look at that paper, if you please, sir. *A.* Yes, sir; this is about the same thing; it was on the margin of the deed, 'Times Journal Printing Company,' Eastman. *Q.* Where is that paper printed? *A.* In Eastman."

This witness also testified, at another time, that he was in error as to the date when he saw that deed in the possession of Judge Goodwin; that he had refreshed his memory, since giving his testimony, which I have just read, by reference to a memorandum in his possession. Then he changed his testimony upon that subject so as to indicate the incident as occurring some time in the fall of last year. This was not all the testimony Mr. Peacock gave, but it is the material portion, which I think proper to read to you at this time. Other portions of his testimony, as I shall presently explain to you, are also material. I read this evidence,

as it is proper to do in a court of the United States, merely to assist the jury, and not to conclude them. You must remember all of the testimony for yourselves; that is peculiarly your province,—peculiarly your duty. Now, if you believe that Mr. Peacock is a credible witness, it is your duty to consider his testimony, which I have just read to you. A jury has no right to disregard the testimony of a witness otherwise credible, and which is intelligent, unless it is impeached in some one or more of the methods pointed out by the law. You have before you, then, in the event you regard it credible, the evidence of Peacock that he saw the deed described in the indictment, and in the handwriting of Luther A. Hall, the prisoner, in the possession of Judge Goodwin in the fall of last year. You have it from the same source that the witness offered Goodwin from $75 to $100 to obtain the possession of that deed. Now, gentlemen, is this testimony of Mr. Peacock so corroborated by other material circumstances as will support and strengthen it, so as to destroy the equilibrium between it and the testimony of the prisoner, on which the perjury is assigned? If it is, and if, when so corroborated, you believe it to be true, you will be justified in convicting the prisoner, notwithstanding the fact that other witnesses who may have testified for the prosecution are of doubtful truthfulness. Of course, if he is not credible, if his testimony is of that sort that you cannot, acting under your oaths, accept it, or, if credible, if it is not corroborated by other independent material circumstances which strongly tend to establish its truth, you cannot upon it convict the prisoner, and you must, in that event, acquit the prisoner, unless the testimony of the other witnesses is sufficient to turn the scale in behalf of the government. This being true, it will be your duty to inquire if there is, in the evidence which has been submitted to you, sufficient circumstances of corroboration so to turn the scale, and satisfy you that the testimony of Peacock is true, and that the testimony of the prisoner, upon which perjury is assigned, was false, and that he did not believe it to be true. Now what are the circumstances of corroboration upon which the prosecution relies? So far as I can I will allude to them in the order in which the proof was offered. It is in evidence that the prisoner was a defendant to a bill in equity in the circuit court of the United States, and that by decree of that court he was, in the year 1885, restrained with others from any interference with the lands of the Dodges in this district. That bill and the decree is in evidence before you. From this you will be justified in concluding that the defendant had, previously to that decree, been interfering with the lands of the Messrs. Dodge, and that the action of the court was necessary in order to protect the plaintiffs in the bill in their property rights. It is in proof that a Mr. Doughtry has testified that in the latter part of the year 1889 he met the prisoner on the railroad near Rochelle, and that the prisoner told him he would have a man on every one of the Dodge lots before Christmas. It is in evidence that these lots, 315 and 286, in the sixteenth district of Dodge county, were Dodge lots, and it appears from the decree that the defendant was enjoined from any interference with them. It appears further from the

evidence that the person (Judge Goodwin) to whom the government insists the prisoner made the deed which Mr. Peacock says he saw, did actually go into possession of the lots 286 and 315, and did make improvements thereon, such as building houses and clearing lands. This evidence is not contradicted, and a portion of the improvements and clearings, according to the testimony of a Mr. McRimmon, have been seen and examined since this trial began. According to the testimony of this witness, from the appearance of the houses, they would seem to be about a year old. It is also in evidence that at dates approximating the period when the witness Peacock, testifies that he saw this deed in the handwriting of Luther A. Hall, and in the possession of Goodwin, that the prisoner made other deeds of a similar description, written on blanks similar to that on which the deed in dispute was said by Mr. Peacock to have been written, to one Joel Mullis, and another to one G. W. Evans, and other deeds, with the exception of one lot, being to lots belonging to the Dodges, and with which the prisoner was enjoined from interfering. The testimony of the witnesses Mullis, Wilkerson, and Evans was substantially the same. They had heard that the prisoner was "issuing" lands, or "giving out" lands, or "furnishing lands on good terms." They went to him at his office in Eastman, at least Mullis and Evans did, if their testimony is entitled to your credit, and it is not disputed, save by the testimony of the defendant himself, to which I shall presently advert. Another witness, a Mr. Cooper, testified to similar facts. His testimony related to lot 281 in the sixteenth district of Dodge county. He testified that he went to the office of the prisoner; that the prisoner said to him:

"If I [the witness Cooper] would go in possession of any of these lots, he would furnish me with that title, and, if I had any trouble in it, he would defend me for one-half of the land; in other words, he would defend me for one hundred dollars."

In answer to a question in regard to how much land, Mr. Cooper testified: "He said take as much as I wanted; just so I didn't take enough, I forget the amount of it, so it might be kept out of the United States court." The witness stated that this conversation took place about the last of September or the first of October of last year, 1889. The witness stated that he lived within a mile of Eastman, and was a farmer. This witness produced no deed, but testified to the number of the lot by reference to a memorandum he had made from a sworn statement he had given some time after the alleged transaction. G. W. Evans and Joel Mullis both gave testimony to identify the deed, which they swear the prisoner, Hall, furnished them. These deeds are in evidence before you. There is evidence, which, if credible, tends to show that these papers are in the handwriting of the prisoner throughout,—signatures, names of subscribing witnesses, as well as the body of the deed. It is insisted by the government that an inspection of these deeds by the jury will show their spurious and criminal character, and that they are in all respects in the handwriting of the prisoner. The prisoner himself, so far as I now remember,—and if I am wrong the jury will correct me,—made no refer-

ence in his testimony to the alleged transaction with Cooper, and, if I am right, the testimony of Mr. Cooper is uncontradicted. As to the Mullis and Wilkerson transaction, and the Evans transaction, the prisoner stated that he drew the deeds as an attorney at law, but that they were signed by the makers, whose names purport to be attached, and by the subscribing witnesses. He also signed as a subscribing witness and notary public of the state. It is true, gentlemen, that neither the grantors nor the subscribing witnesses to these deeds were produced as witnesses here, and if these deeds are genuine—that is to say, real—deeds, from actual grantors, with real subscribing witnesses, the testimony of such grantors and subscribing witnesses would have been of material importance, and the failure to produce them, if he could do so, raises the presumption against the prisoner that no such persons were in existence. Does it appear that he has made any effort to obtain their testimony? That is for the jury to answer. Are these real deeds then, with real subscribing witnesses, and real grantors?

All of the lots concerned except one, the number of which the witness Evans testifies was written into the deed by the prisoner after the deed had been previously drawn, are Dodge lots. The testimony of the defendant as to these deeds is that he had no connection with them, save that of an attorney at law; and, if this be true, and if the deeds were genuine, and signed by real grantors, no culpability, so far as the present inquiry is concerned, could attach to the defendant therefrom. If, however, you credit the testimony of the witness who testified that the deeds, signatures and all, were throughout in the writing of the prisoner, or if you find from inspection that this is true, in view of the prisoner's testimony as to the deeds, there can be no other conclusion save that the deeds are forgeries, and, if forgeries, relating, as they do, to the Dodge lots, having been prepared about the time when the alleged deed to Judge Goodwin was prepared, and being written on blanks printed by the Times Journal Newspaper of Eastman, their execution by the prisoner would, in the opinion of the court, tend strongly, in connection with the other evidence recited, the declaration of Doughtry, and the transaction with Cooper, to corroborate the testimony of Peacock as to the existence of a similar deed to other lots belonging to the same parties, to-wit, the Dodges, and that such corroborative evidence would be material to the issue on trial, namely, whether or not the prisoner testified falsely, not believing his testimony to be true, in swearing that he had made no such deed, nor delivered it to Judge Goodwin, nor had any landed transactions with him. Of course, gentlemen, with reference to all of this corroborative evidence, you should consider what the prisoner himself has testified. Under the generous and humane system to prisoners prevailing in the federal courts, the prisoner is permitted to testify in his own behalf, and it is for the jury to pass upon the credibility of his testimony, as in the case of another witness. It is also true, however, where there is a conflict between witnesses, the rule of evidence for the guidance of the jury is this: preference should be given to the testimony of that witness who has the least inducement, from interest or other mo-

tives, to testify falsely. You will therefore consider, in weighing the testimony of the prisoner and the witnesses' Doughtry, Cooper, Evans, Mullis, and Wilkerson, who has the least inducement of interest operating upon the mind and conscience. I need not advert to the interest the prisoner obviously has in the result of your duty; and, if the evidence discloses any interest in the four or five witnesses for the prosecution whom I have just enumerated, you should recall it, and give it proper consideration. You should likewise give proper effect to the absence of such interest, if it exists on the part of such witness. It is also proper that you should consider, if the explanation which the prisoner has given of the execution of these deeds be reasonable on its face, or credible by intelligent minds. If the names of the grantors are not written in the deeds, and if you believe from the evidence of Peacock and the other evidence that this was true of the alleged Goodwin deed, this, too, with the other evidence, might be a circumstance which might tend to show that they were executed by one and the same person, as a part of a common plan or design, and this would be strengthened as corroborative evidence, if you also believe that they were all in the same handwriting. The prosecution insists that strong corroborative evidence of the criminal purpose of the prisoner to make and use forged deeds to land is found in the letter to Louis Knight, dated November 22, 1889, and directed from Eastman to Poplar Hill. Also in the package of paper of a certain description, which was sent from the prisoner to the same person about that time, with a note or memorandum of direction, which was also in evidence. The letter is as follows:

"EASTMAN, GA., Nov. 22, 1889.

"*Mr. Louis Knight*—DEAR SIR: Inclosed I'send you copies of deeds as I wish. Get up the deeds just like these, except as to the age, and send them as early next week as you can, and I will make it all right with you. Write me what day you will send them. Obt., L. A. HALL.

"P. S. I will send more soon."

This memorandum was accompanied by some blank paper of a special character, and reads:

"Use this if you can, as soon as possible, & send me. I have sent for some that is better. L. A. HALL."

With this letter there was inclosed a number of deeds, which are also in the handwriting of the prisoner; in fact, he admits writing the letter and the memorandum, and sending the deeds and the package of special paper. What is the import of this letter? The jury will, in the discharge of their grave duty, give it the reasonable construction which belongs to it, in view of the evidence. The explanation given by the defendant is, that he prepared the deeds in question to annex to a bill in equity which he had brought, or intended to bring for one Tom Griffin, against a certain turpentine company, the name of which he testifies that he could not recall; that, the controversy involved in the bill being settled, he inclosed these copy deeds to Louis Knight, to have them written up and prepared as forged deeds, to be used thereafter for the bene-

fit of his clients, but only to test, by their use, the skill and accuracy of witnesses who would testify to the genuineness of ancient documents. Of course, gentlemen, if this explanation is accepted by you, no criminality can attach to the defendant because of this evidence; but is it reasonable or probable—is it likely—that the defendant could recall the name of the plaintiff to the bill in equity, and be unable to remember the name of the defendant company engaged in gathering turpentine with whom a settlement was effected? That is for the jury to say. Is it reasonable that he would require so many forged deeds to utilize as a test to show the unreliability of witnesses? You will observe that in the postscript to the letter he says also that he will send some more soon. Would or not the package first sent, comprehending numerous deeds, be ample for all purposes as decoys or tests? Why should he send more? Why, too, should he exhibit, as appears from the memorandum inclosing the blank paper, anxiety to have the deeds, so gotten up and aged, returned early next week? You will bear in mind what he says, and, applying to it the usual test which men of business and intelligence apply to kindred transactions in the ordinary affairs of life, you will say whether you believe the explanation of the defendant is reasonable or credible. The defendant is an attorney at law, and if the expedient to which he states he had resorted as an attorney, for the purpose of detecting forgeries in behalf of his clients, is reasonable or probable, would it not have been proper, if true, for him to have shown the propriety of his actions by some attorney? By his statement under oath these papers were copies of deeds that had been intrusted to him by his client, for the purpose of that client's equity suit. Is it competent, or usual, or reasonable that an attorney would have forgeries made of his client's title papers? These inquiries the jury should make and determine properly. The government insists that these papers were sent to Knight to enable Knight, or some person for him, to manufacture forged deeds; and the fact that the prisoner sent them with the request to get them up just like the deeds inclosed, "except as to the age," and also sent paper suitable for the purpose, with the promise to send more, with a request to send them back early next week, tends, as the government insists, to show that the defendant was in the business of getting up and using forged deeds to lands in that section of the state; and the prosecution insists that this is strongly corroborative of the testimony of Peacock, that he furnished to Goodwin the deed in controversy, about the existence of which the assignment of perjury is made. Upon this subject the court charges you that, if you believe from all of this evidence that the defendant was engaged in this business, it is proper that you should consider it as tending to corroborate the testimony of the accusing witness, for the reason that it tends to show a guilty and criminal purpose with reference to the forgery of land-titles as a business, and may serve to throw light upon the question whether the prisoner furnished the forged or fictitious title about which the assignment of perjury is made. This letter having been written the 22d day of November, 1889, or near that time, it would be substantially in approximation also, to the time mentioned by the witness

Peacock when he first saw the deed, as he says, in the custody of Judge Goodwin. If, gentlemen, you believe also from the evidence that Peacock saw the deed, and if you believe that thereafter he offered Judge Goodwin $75 or $100 for it, it is a circumstance that you should consider as tending to show the good faith of Peacock, in his testimony that he saw the deed. To sum up the instructions of the court on this branch of the case, I will repeat that, if you believe that Peacock is the single accusing witness who is credible, you would not be justified in convicting the defendant on his testimony, unless you also find that he is strongly corroborated by the independent and material circumstances of the case. If, however, you believe and are satisfied that he is sufficiently corroborated as to the matter about which the perjury is assigned by the several circumstances of corroboration which the court has detailed, as relied upon by the government, or by a sufficient number of those circumstances, it will be your duty to convict the defendant, notwithstanding you may believe it your duty to totally disregard the testimony of the witnesses Joe Hamilton and the two Goodwins, with relation to whom the defendant insists an impeachment is made.

Is the testimony of Mr. Peacock credible? That inquiry is entirely for the jury. Upon this subject it is proper to remind you that the defense relies upon what they insist are contradictions between his testimony on the former trial and his testimony on this trial. If you believe from the evidence that there are important or material and unexplained contradictions between the testimony of Mr. Peacock on the former trial and his testimony on this trial, it would tend to throw suspicion on the reliability of his testimony; but if you find from the evidence that the contradictions were immaterial, and such as a conscientious man might well make,—for instance, an error on the former trial about a number, or a date, which the witness positively corrects on this trial,—such variation, instead of reflecting upon the witness, is rather a circumstance in his favor, as possibly tending to show that he had not prepared with accuracy a fictitious statement, to mislead the court. At best the human memory is fallible, and courts and juries can only demand that the material facts be accurately remembered and correctly given in evidence. It is difficult to find two men, however conscientious, who will give precisely, and in all respects, the same account of a transaction to which they are eye-witnesses. It is also true that few men can give, in every *minutiæ*, two identical accounts of one occurrence, especially when those accounts are given at different periods. If, however, you believe that Mr. Peacock has willfully contradicted his testimony, or that he has spoken positively to matters about which he is ignorant, you should discard his testimony from your consideration. It is true, moreover, that, where a witness is impeached by proof of contradictory statements, he may be sustained, and his credit restored, by proof of general good character. It is common, when contradictory statements have been put in evidence, to sustain the witness by proof that he is a man of good character, with scrupulous regard for truth and veracity; and if you believe that contradictory statements of Mr. Peacock

have been shown which would otherwise discredit him, you will then determine whether there had been such proof of his general character for truth and veracity as will justify you in accepting his positive assertions of facts on this trial. The credibility of a witness, as I have heretofore said, is a matter peculiarly within the province of the jury. If, after considering the testimony of Mr. Peacock, and the circumstances relied on to corroborate him, to which your attention has been called, under the rules I have given you, you are not satisfied that the government has avoided the presumption of innocence, which in this, as in all cases, through the humanity of the law, attends the prisoner, you will look to the other evidence, and determine its probative effect; that is, its effect as proof, taken in connection with the testimony of Peacock, and the independent and material circumstances, the declarations, letters, deeds, etc., which the prosecution asserts are sufficient to warrant you in finding the defendant guilty. In this connection you will consider what weight is to be given to the testimony of Judge Goodwin and of Joe Hamilton and of Joe Goodwin. If you believe that these witnesses have been impeached, and that they are unworthy of credit, you should discard their testimony altogether, unless you find that it is so corroborated by the testimony of other witnesses who are credible, and by the general facts of the case, as will justify you in relying upon it, with the other testimony taken and considered together. Although a witness may be successfully impeached, the jury may believe him in whole or in part, if they are satisfied, from all the evidence, that he is telling the truth, in whole or in part. Much has been said to the jury about the perjury of Judge Goodwin, and it is insisted by the defendant that no one should be convicted on his testimony. It is proper, however, for the jury to remember that the government begins its case with the frank avowal and notice to the jury that Goodwin swore falsely on the former trial, and on Saturday of that trial. He denied positively, in answer to the *subpœna duces tecum*, that he had the deed therein described to lots 315 and 286 in the sixteenth district of Dodge county, which the plaintiffs then insisted had been made and delivered to him by Luther A. Hall. It appeared from the record that, after hearing the evidence, he was adjudged contumacious and disobedient to the order of the court. On Monday he came forward to purge himself of his contempt, and he then testified substantially as he has testified before you, the gentlemen of this jury. As I have said, the credit to give this and other witnesses is entirely for the jury; but it is proper, gentlemen, that you should bear in mind that this witness, who is a colored man, and who is shown to be a farmer living in Dodge county, tells you that he testified on the first trial under the fear of personal injury, and it is for the jury to say, in view of all the evidence developed on this trial, whether that statement of the witness was true. You will also bear in mind that Mr. Peacock testified that the witness told him the same thing when he (Peacock) offered him $75 or $100 for his alleged deed; and, if Mr. Peacock's statement is true, it would serve to confirm the testimony of Goodwin to the effect that he was testifying under what the law terms "duress." That means

the state of compulsion or necessity in which a person is induced, by actual or threatened violence, to do or not to do a certain thing. If you believe from the evidence that his original testimony was given under such fear of bodily injury as would control his will and his evidence, while it would not excuse him from the crime for which he stands indicted, and which he has yet to answer, it would be material evidence for your consideration. You desire to get at the truth, and it will be your duty to accept the truth, if it be the truth, no matter how it comes to you. The cases are numerous where this precise state of facts has been passed on by the courts. I read from a decision of the supreme court of Georgia:

"It is the well-settled rule that, if a witness knowingly and willfully swear falsely in a material matter, his testimony should be rejected entirely, unless corroborated by the facts and circumstances of the case, or other credible evidence. *Pierce* v. *State*, 53 Ga. 365, 369. But it is for the jury to give credit to the impeaching testimony, or the actions sought to be impeached, and to determine for itself whether to believe the one or the other; and it is for the jury to determine whether the first swearing was willfully done, or under coercion, as put by the presiding judge in this case. The credibility of all witnesses is for the jury. The weight of all evidence is for their judgment, and this has been extended even to embrace their personal knowledge of the character of witnesses sworn before them. *Head* v. *Bridges*, September term, 1881, (not yet reported,) Pamph. p. 56, [67 Ga. 227.] In the case here, construing the charge given by request with the general charge, it amounts to this: When a witness is satisfactorily impeached by testimony you believe, then his evidence should be rejected, unless corroborated on a material point; but whether he be impeached or not is for you to say, and though others contradict him, you may believe him and reject them; and, though he swore differently on a former trial, you may still believe him on this trial, if he swore under duress of bodily harm on the first." *Williams* v. *State*, 69 Ga. 34.

In *Hunter's Case*, 43 Ga. 496, a witness was introduced who had sworn differently from his testimony then before the court. When being examined before the jury he testified:

"I was sworn on the inquest. What was read over, I testified then. Swore to tell the whole truth then, but was afraid, because Mr. Hunter, the defendant, threatened my life for seeing what I did. He threatened it when I first came up in my yard. No one was present but he, and I swore on the inquest to a lie, because I was afraid to tell the truth."

The defendant in that case sought to impeach the witness because of that testimony before the inquest, just as the prisoner here has attempted to impeach Judge Goodwin because of his testimony on the former trial on Saturday, corrected by him on Monday; and on that subject the supreme court of the state declared as follows:

"The attempt of the defendant by cross-examination was to impeach the witness in showing his contradictory statements, and he was entitled to give a reason for these contradictory statements, elicited by cross-examination, by showing that he was in fear at the time he uttered them."

The principle so well announced by the supreme court of the state is fully applicable to the facts here, and it is for the jury on their con-

sciences to say whether they believe that Judge Goodwin actually testified under fear on Saturday. If he did, that fear might operate to explain his subsequent declarations to Coleman or Scarborough, if he made them. These were made, as I remember the evidence, while Goodwin was said to have been with a party of men of his own color, going down Fourth street, on Saturday night. On this subject the jury will do well to remember the testimony of Mr. Hill, as well as the judgment of the court in evidence, to the effect that Goodwin was in custody Saturday night, having been adjudged in contempt Saturday morning; and they will say from this whether it be true that he made the declarations with a party on Fourth street, or whether it be true that at that time he was in charge of an officer of this court, as he himself testified in denying this statement. Any suggestion made that Goodwin was coerced into his testimony is literally without evidence to support it, and is contradicted by the record. He is now under indictment for perjury, and must stand his trial as other persons accused.

With reference to the testimony of Joe Hamilton, the court calls the attention of the jury to this legal principle: When the law obliges a party to call a witness, he can hardly be considered as the witness of the party calling him; and, says Prof. Greenleaf in his authoritative treatise on the law of Evidence:

"it is exceedingly clear that the party calling a witness is not precluded from proving the truth of any particular fact by any other competent testimony in direct contradiction to what such witness may have testified, and this not only where it appears that the witness was innocently mistaken, but even where the evidence may collaterally have the effect of showing that he was generally unworthy of belief." 1 Greenl. Ev. (14th Ed.) § 443.

Now to apply that rule to Joe Hamilton's testimony. He could hardly be called a witness for the prosecution. The court compelled the district attorney to call him, because it felt the government was under obligation to do all in its power to account for the alleged deed in controversy. The district attorney is therefore at liberty to disprove any fact testified to by Joe Hamilton. It is true, however, that the testimony of Joe Hamilton in any event is not specially important. He was introduced more with the purpose to authorize the production of secondary evidence, than to show anything about the existence of the deed, of which, so far as the evidence discloses, he had no special knowledge; and that was not a question for the court. The jury would be misled, therefore, if they should be induced to regard his testimony as vital to the case. While it is true that the court required the district attorney to introduce Hamilton to testify to the jury, if he could, as to the final disposition of the alleged deed, this does not specially illustrate the question of its existence. The question whether oral contents of a written paper shall be admitted to the jury is a question for the court, and not for the jury. It is not for you to say whether evidence is admissible. The court has admitted the verbal proof of the alleged deed to you for satisfactory legal reasons, and the testimony of Joe Hamilton, relating, as it does, mainly to a preliminary matter for the court, is not evidence on which the issue here de-

pends. You should not permit your minds to be led away from the true issues and the material evidence upon which your verdict should be made.

Nor is the testimony of Joe Goodwin of special importance. He testified here that he had seen the deed, but he also testified that he could not read, and his only knowledge of the deed, therefore, was what Judge Goodwin may have told him. In that form his evidence would probably not even have been admissible had the question been made. Of the impeaching witnesses, one testified (Mr. Herman) that he (Joe) said he had seen no deed. The others, the two Drs. Buchan and Arnold Brown, said that his statement was that he had seen a paper that Judge told him was a deed, but he did not know whether it was a deed or a marriage license. It is true, also, that one or more witnesses testified to proof of his general bad character for truth and veracity.

It is true, gentlemen, that in this, as in all criminal cases, the burden of proof is on the prosecution to satisfy the jury of the truth of its charge against the person accused. It is true, moreover, that absolute certainty is not attainable in any trial. A greater degree of mental conviction is required in criminal cases than in civil cases. The degree of satisfaction and certainty required is not, therefore, absolute conviction or certainty, but the evidence must produce that effect on the minds of the jurors that after its consideration they can, in view of their oaths to impartially try him, have no reasonable doubt of the guilt of the party accused. By a reasonable doubt is not meant a strained or whimsical conjecture, but an actual mental hesitation, caused either by insufficient evidence or unsatisfactory evidence. Of course you will understand that in this, as in all cases, the prisoner is entitled to such a doubt as I have described.

It has been made necessary for the court to advert to the difference which exists between the duties of a presiding judge in this court and the duties of a similar officer in the state courts. In the state courts, the judge, as I understand the rule, can give no intimation to the jury with reference to the evidence. The decisions are piled up under section 3248 of the Code of Georgia, finding the judges in error in any sort of expression by the judge with reference to what has or has not been proven. The statute has expressly decided in the case of *Railroad Co.* v. *Putnam* to have no standing in the courts of the United States. 118 U. S. 545, 7 Sup. Ct. Rep. 1. It is, in my judgment, a great defect in the law of our state. The experienced and able jurists who preside in the courts of the state because of this rule are almost powerless to aid the jury to ascertain the truth, and to make a proper verdict, and thus the people are, in large measure, deprived of the best results of the training, skill, and experience of their judges. The judges in the state courts may lay down general instructions as to the law. In the language of one of the most distinguished law-writers of the country, Mr. Thompson, the author of the Law of Negligence, and other works:

"Such a system is scarcely more wise than it would be to select a lawyer, a doctor, a clergyman, a farmer, a merchant, a carpenter, a shoemaker, a blacksmith, a saloon-keeper, a street-car driver, a capitalist, or a barber, constitute

them a ship-crew, and start them out on a voyage in company with an experienced navigator, who is permitted to give them general instructions on the theory of navigation, but who is prohibited from giving them any positive order how to navigate the ship, and from correcting any blunders they may make in navigating it."

It is quite otherwise in the courts of the United States. Questions of law are to be determined by the court, and questions of fact by the jury; and the court has no power, and, I may say, no desire to control the action of the jury upon the facts. I repeat to you, you should remember and find all the facts for yourselves. And I now read from the decision of the supreme court of the United States, *Nudd* v. *Burrows*, 91 U. S. 439. You must distinctly understand that what the court said about the facts is merely advisory, and in no wise intended to fetter the exercise of your own independent judgment. It is the right and duty of the court to aid the jury by "recalling the testimony to their recollection, by collating its details, by suggesting grounds of preference where there is contradiction, by directing their attention to the most important facts, by eliminating the true points of inquiry, by resolving the evidence, however complicated, into its simplest elements, and by showing the bearing of its several parts and their combined effect, stripped of every consideration which might otherwise mislead or confuse them. How this duty shall be performed depends in every case upon the discretion of the judge. There is none more important resting upon those who preside at jury trials. Constituted as juries are, it is frequently impossible for them to discharge their function wisely and well without this aid. In such cases, chance, mistake, or caprice may determine the result." The courts of the United States are therefore enabled to direct the attention of the jury to the salient and vital portions of the evidence, and to recall to their consideration the duty they owe, as well to the public as to the prisoner and those connected with him, where matters have been presented and appeals made which are calculated to mislead the jury with regard to their duty as to the issue to be tried by them, and which might mislead the jury into the belief that there is a conflict between the court and the jury as to their respective duties. If such impressions have been made upon the jury, they should be utterly discarded, as having no place in the minds of upright men, who are gravely inquiring into the truth or falsity of a simple issue. It is the province of the court to sum up the salient evidence in the case, and give you in charge the law applicable to the facts; and it is your duty to apply the law as given you in charge by the court to the facts as you may find the facts to be proven. Because I am aware that some of you are not familiar with the practice of the federal courts, and because I have felt that you might be misled as to the correspondent duty of the court and jury, I have thus adverted to this topic. I may add that it is usual and appropriate for questions of law to be argued to the court, and for the jury to take the law from the court. I am sure I need not reiterate or elaborate to you a proposition which every one must understand. You will only do your duty to the public, and as well as to the accused,

in this case, by excluding from your minds promptly, manfully, and sternly all impressions which may have been placed there, or which may have unconsciously found their way there, which are not made by the evidence or the law. The certainty, the regularity, and the inexorable firmness and justice of the action of courts and juries are the absolute and indispensable requisites to the preservation of our civilization. The certainty ceases to exist when the juries are to be moved by appeals to the tender emotions of human nature, to the distress of the unfortunate, to sympathy for the helpless, to the sorrows of the prisoner's family. The regularity of jury trials vanish when juries can be misled into antagonism to constituted authorities, upon feigned issues when no sort of antagonism should exist, and when all are animated simply by an anxious desire to ascertain the truth, and to give due weight and importance to evidence. The firmness and justice of juries are as intangible and uncertain as the viewless winds when they will consider as a guide anything save the law, commanding that which is right, and prohibiting that which is wrong. From the disregard of these considerations, countless little children suffer the ills and calamities which follow the reckless disregard of law and right. Countless families mourn because the administration of the law is at times uncertain and feeble, irresolute and wavering. I say these things to you, gentlemen, not to impress you with anything save this, and that is the solemn and elevated public duty for which you have been selected and designated by the machinery of the law. The duty is as much the due of the prisoner as of the public, and I trust and believe you will approach the consideration of this evidence with the fixed and calm resolve of upright men and worthy jurors, to do full justice to the prisoner and to the public.

In conclusion I desire to invoke at your hands the most careful and impartial examination of the evidence adduced on this important trial. I think you will not find the issues much simplified, and I trust and believe that you will be able to attain a just and righteous verdict at once, protecting the vast interests committed to your care, and the prisoner in the enjoyment of his right to an unprejudiced and impartial trial. In the indictment both counts relate to the same general transaction, and your verdict will therefore be in the usual form.

The prisoner was convicted.