**James ARENA, Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 14516.**

United States Court of Appeals
Ninth Circuit.

Oct. 5, 1955.

Rehearing Denied Nov. 7, 1955.

A. J. Zirpoli, C. Harold Underwood, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., Robert H. Schnacke, Richard H. Foster, Asst. U. S. Attys., San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, and ORR and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

In a perjury case, the rule requiring corroboration of a single witness as to the falsity of the defendant's testimony is, like Iago's wine, "a good familiar creature, if it be well used." [1]

But when the rule is perverted so as to require the prosecution to "prove its case twice", it cannot be said to be "well used".

The appellant, however, professes that he "does not contend that the government should be compelled to prove its case twice". He also complains that "Appellee's brief incorrectly attributes to appellant the proposition that 'the corroborative evidence must "of itself" prove guilt'". Yet such double proof is precisely what the appellant exacts of the appellee when he says:

> "The asserted corroborative evidence in the instant case is not direct or positive or inconsistent with the innocence of the accused. *It*

---

1. Othello II iii 313–314.

*does not 'of itself' prove guilt."* (Emphasis supplied.)

The law does not demand of the appellee so inordinate a measure of proof.

## 1. *Statement of the Case*

The indictment charged the appellant in two counts with violations of 18 U.S. C.A. § 1621, infra. The District Court entered a judgment of acquittal on the second count. The charging part of the first count is set out in full in the margin.[2]

The jury found that appellant was guilty on the first count, and he received a sentence of three years' imprisonment.

Section 1621, the perjury statute, reads as follows:

"Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years or both."

## 2. *The Facts*

The appellant did not take the witness stand and no evidence was offered in his behalf. Since one of the errors specified by him is that "The evidence was insufficient as a matter of law to sustain the verdict", in considering the facts we must grant every reasonable intendment in favor of the appellee.

Irving Baskin testified that in Oakland, California, he was employed part time by Zola S. ("Tiny") Heller, in taking care of the records of the latter's "legitimate businesses"—"a hotel and a bar and a liquor store". Heller was also a "betting commissioner", defined by the witness as "a person that takes wagers". Baskin also prepared Heller's tax returns, did his banking for him, obtained

2. "(3) That on May 6, 1953, at San Francisco, * * * (the appellant) * * * wilfully, knowingly, and contrary to his oath, testified in a material matter, in answer to questions propounded at (certain grand jury) proceedings, as follows: "Q. (By Mr. Olney): I see. On this occasion Mr. Baskin says you accompanied him to the bank while he proceeded to cash some checks in return for which there were 38 one thousand dollars (sic) bills which were obtained from the bank, and that the teller counted that $38,-000 out in your presence to him and he in turn counted the $38,000 in these one thousand dollars (sic) bills to you and give (sic) you the bills. A. I didn't get them sir. "Q. Did that happen? A. No sir. "Q. Anything like it? A. No sir. "Q. Did you ever go there to the bank with this Baskins (sic)? A. No, but I was in that bank most every single day in my own business. I have seen and been in there dozens of times, I will say, but I am always in that bank ever since I had my liquor business, that is where I used to bank. "Q. Has Mr. Baskin ever delivered any money to you? A. No sir.

"Q. Even one cent? A. Never had occasion to. "Q. (By Mr. Burke): Your testimony is that on no occasion did anyone ever pay you any amount of money, one dollar or $38,000 to be delivered to you personally as your own money or on behalf of Mr. Samish or anyone else? A. That's correct, Mr. Burke. "Q. (By the Foreman): Did you ever do any business with Mr. Baskin or have any transaction with Mr. Baskin in any bank in Oakland? A. I did not, sir. "Q. And you never received $38,000 from Mr. Baskin? A. No sir. "(4) That in truth, as the defendant James Arena then and there well knew and believed, the foregoing testimony was false. "(5) That the questions asked and the testimony of the defendant, heretofore alleged, were material to the proceedings then being conducted by the Grand Jury, and the testimony of the said defendant, by reason of its falsity and known untruthfulness, so known to the defendant, did thereby impede and dissuade the Grand Jury in performing an expeditious inquiry."

information from him regarding "the betting commission operations", examined the "betting commission" records, recognized Heller's handwriting therein, etc.

Baskin had known the appellant since 1941 or 1942. The appellant was in the Heller establishment during the end of Heller's operations in 1947 three or four times a week. On two or three occasions, the witness was handed sealed envelopes by Heller for delivery to the appellant at the latter's liquor store. The witness would deliver the envelopes.

In early December, 1947, Heller, in the appellant's presence, handed Baskin a group of checks and told him to "get them cashed into one thousand dollar bills and then give them to Jimmy (the appellant)". The checks amounted to $38,000.

The appellant and Baskin left Heller's liquor store and went to the bank, about two blocks away. They stepped to the window of Herman Wirth,[3] a teller, who counted out thirty-eight one-thousand-dollar bills to Baskin.

Baskin's precise testimony at this crucial point is as follows:

"I gave (the checks) to Mr. Worth (sic). Mr. Worth took them to the Chief Clerk to get them okayed. * * * his name was Madeiras. * * *

"Mr. Worth came back to his cage and he got all the thousand dollar bills he had, there wasn't enough bills, so he asked Mr. Seale for his thousand dollar bills. Between the both they scraped up 38 one thousand dollar bills. * * *

"We went to the back of the bank. * * * We both stayed on the other side. * * * Mr. Worth was behind the counter. * * *

"I told Mr. Worth to count the money out in stacks of ten, with eight being the last one. I wanted to make sure all the money was there. And Mr. Worth counted the money out in stacks, three stacks of ten each and one of eight. Then I called Mr. Arena over and I counted the money over to him. He took the money, put it in his pocket. * * * We both walked out of the bank. * * *"

The next witness was F. W. Whitted. He was employed by Heller from April, 1941, until the end of October, 1947. His duties were to "make the prices" on baseball games; that is to say, to determine the odds on a particular game.

The appellant was on Heller's premises "five or six times a week at least" during the period in which Whitted was associated with Heller. In 1946 and 1947 the appellant placed bets ranging "from $100 to two or three thousand dollars". The witness sometimes recorded the appellant's bets. Five cards or "parlay tickets" admitted in evidence showed that the appellant had won $7900 in one transaction, on October 26, 1946.

The foregoing bet, however, was placed by the appellant on behalf of Arthur H. Samish, whose income tax liability was being investigated by the grand jury before which the appellant is charged to have sworn falsely. At first, Samish placed his own bets, but later the appellant did so. When the appellant placed the bets, the bettor was designated in Heller's books as "SA": when Samish himself did the placing, the designation was "AS". Whitted recorded transactions on behalf of Heller.

Heller's widow testified that she recorded bets for her husband. He conducted his betting activities at home as well as in his office behind the liquor store. She identified a number of his business papers as being in his own handwriting. She testified that in her husband's books the initials "S.A." meant "Artie Samish Account to James Arena (the appellant)".

3. Wirth's surname also appears as "Worth" in the record, but a "teller's pay proof", which is an exhibit in this case and which apparently contains his signature, gives "Wirth".

She identified a document containing wagers for Samish for the week ending November 30, 1947, showing that the latter won $34,800. She explained that the "remarks" in connection with a check dated December 3, 1947—"S.A." "A.C.T."—indicated "Artie Samish account". The check was for $6,050.

Earl Madieros,[4] assistant cashier of the Twelfth and Broadway branch of the Bank of America in Oakland, said that in December of 1947, the paying teller presented to him four checks for approval for cashing. The checks totaled $38,-000. Not being entirely familiar "with all the procedures on Tiny Heller's operation", he referred the matter to a senior officer of the bank, and when the latter gave him the "nod", Madieros approved the checks and handed them back to the teller for cashing. Wirth was the teller.

The checks were for $6,050, $13,700, $9,350, and $8,900.

Finally, there was read to the jury a portion of the transcript of the appellant's testimony before the Grand Jury on May 6, 1953. In that testimony the appellant declared that he knew nothing about five "Sacramento Football Selections" cards for Saturday, October 26, 1946, all bearing the initials "J.A." He also denied that he had placed the bets represented by the cards, denied that he had placed the bets with Whitted, and expressed the belief that he had never placed any bets with the latter.

It will be recalled that Whitted testified that in 1946 and 1947 the appellant placed bets ranging in size from $100 to $2,000 or $3,000. Whitted also identified five "parlay cards" that he had written, showing the appellant as the bettor who won $7,900 in that transaction.

### 3. *There Was Sufficient Corroboration of the Direct Testimony of Baskin*

In open court, counsel for the appellant stipulated that the latter's testimony was "material to the proceedings before the Grand Jury". It is also conceded that there was "direct evidence"—albeit it is asserted to be "The only direct evidence"—"offered by the government to show the alleged falsity of appellant's statements, if believed"; namely, "the testimony of Irving Baskin that early in December, 1947, he went to a branch of the Bank of America in Oakland accompanied by appellant and there cashed four checks for which he received thirty-eight one thousand dollar bills from the teller, Herman Wirth, which he (Baskin) then and there counted out and turned over to appellant."

There remains, however, a final factual question that must be resolved by this Court:

Was Baskin's testimony sufficiently corroborated to support the verdict and the judgment below?

The problem is a unique one, confined almost exclusively to the law of perjury. In Weiler v. United States, 1945, 323 U.S. 606, 608–609, 65 S.Ct. 548, 550, 89 L.Ed. 495, the Court said:

"The special rule which bars conviction for perjury solely upon the evidence of a single witness is deeply rooted in past centuries."

The rule has been sharply criticized by some courts and some text writers. It has been pointed out. for example, that it is inconsistent to rule that evidence sufficient to warrant the death penalty for murder is insufficient to convict a man of perjury.[5]

---

4. Here again there is a conflict in the record, which also shows the spelling to be "Madeiras". The latter form contains the more likely Portuguese diphthong, although the ending "as" is doubtful. The name is probably "Madeiros".

5. See United States v. Palese, 3 Cir., 1943, 133 F.2d 600, 602; United States v. Mar-achowsky, 7 Cir., 1953, 201 F.2d 5, 11, certiorari denied, 1953, 345 U.S. 965, 73 S.Ct. 949, 97 L.Ed. 1384; Marvel v. State, 1925, 3 W.W.Harr. 110, 33 Del. 110, 131 A. 317, 42 A.L.R. 1058, 1060, 1062; Wigmore on Evidence, 3d ed., 1940, vol. vii, Secs. 2040–2041, pages 273–277.

■ Nevertheless, the doctrine has been approved by the Supreme Court. This acceptance, however, has been qualified by certain clear and definite restrictions and limitations, which it now behooves us to examine and to apply to the instant case.

The leading case, not cited in the briefs, in which the rule and its confines were discussed is United States v. Wood, 1840, 14 Pet. 430, 440, 10 L.Ed. 527. There the Court said:

"There must, then, be two witnesses, or one witness corroborated by circumstances proved by independent testimony. If we will but recognize the principle upon which circumstances in the case of one witness are allowed to have any weight, that principle will carry us out to the conclusion that circumstances, without any witness, when they exist in documentary or written testimony, may combine to establish the charge of perjury; as they may combine, altogether unaided by oral proof, except the proof of their authenticity, to prove any other fact connected with the declarations of persons or business of human life."

■ But even where the rule requiring corroboration in perjury cases is applicable, it does not purport to prescribe the *quantum* of corroboration. Citing the Wood case, supra, the Supreme Court, in Hammer v. United States, 1925, 271 U.S. 620, 627, 46 S.Ct. 603, 604, 70 L.Ed. 1118, pointed out:

"That case shows that the rule, which forbids conviction on the unsupported testimony of one witness as to falsity of the matter alleged as perjury, *does not relate to the kind or amount of other evidence required to establish that fact.*" (Emphasis supplied.)

This same liberal canon has been applied by this and other courts of appeals. In Doan v. United States, 9 Cir., 1953, 202 F.2d 674, 680, we said:

"The rule relating to the corroboration which is required in a case of this kind [a perjury and subornation case], is stated by Mr. Wigmore as follows: 'As to the nature of the corroboration, no detailed rule seems to have been laid down, nor ought to be laid down. The jury should be instructed not to convict unless the testimony of the principal witness has been so corroborated that they believe it to be true beyond a reasonable doubt'. Wigmore, 3d Ed., § 2042. 'The sufficiency of the corroboration is, of course, a question for the jury.' [Case cited.]"

Adverting to the ancient rule that required *two* witnesses, the Court in Hashagen v. United States, 8 Cir., 1909, 169 F. 396, 399, said:

"But this strictness has long since been relaxed, and we find many cases in the books where convictions have been sustained upon the testimony of a single witness, corroborated by circumstances proved by independent evidence sufficient to warrant the jury in saying that they believe one rather than the other. In other words, the evidence of the witness, together with the other facts and circumstances proved on the trial, must be something more than sufficient to counterbalance the oath of the defendant and the legal presumption of his innocence."

In Marvel v. State, supra, 42 A.L.R. at page 1062, the Supreme Court of Delaware observed:

"Almost all of the modern authorities hold that the corroborating evidence need not be the equivalent of another direct witness, but that it suffices if any material circumstances be proved in confirmation." [6]

The Supreme Court has related an uncorroborated confession to the testimony of a single prosecution witness in a perjury case. In Warszower v. United

---

6. See also Wharton, infra, Sec. 1585, pp. 1839–1840.

States, 1941, 312 U.S. 342, 347–348, 61 S.Ct. 603, 606, 85 L.Ed. 876, the Court used the following language:

"An uncorroborated confession *or evidence of perjury*, given by one witness only, does not as a matter of law establish beyond a reasonable doubt the commission of a crime but there are exceptions to the normal requirement that disputed questions of fact are to be submitted to the jury under appropriate instructions." (Emphasis supplied.)

Accordingly, we advert to the decisions dealing with the quantum of corroboration required in confession cases.

In Opper v. United States, 1954, 348 U.S. 84, 92, 93, 75 S.Ct. 158, 164, the Supreme Court stated:

"We next consider the extent of the corroboration of admissions necessary as a matter of law for a judgment of conviction. * * * Each case has its own facts admitted and its own corroborative evidence which leads to patent individualization of the opinions. *However, we think the better rule to be that the corroborative evidence need not be sufficient, independent of the statements, to establish the* corpus delicti. It is necessary, therefore, to require the Government to introduce substantial independent evidence which would *tend* to establish the trustworthiness of the statement." (Emphasis supplied.)

In Mangum v. United States, 9 Cir., 1923, 289 F. 213, 216, a frequently cited case, this Court affirmed a judgment by District Judge Sawtelle, who later became a member of the Court of Appeals. In that case the following language was used:

"Evidence aliunde, however, as to the corpus delicti, need not be such as to alone establish the fact beyond a reasonable doubt. It is sufficient if, when considered in connection with the confession, it satisfies the jury beyond a reasonable doubt that the offense was in fact committed, and the plaintiff in error committed it. [Cases cited.]"

During the intervening third of a century, the doctrine in the Mangum case has been endorsed by this and other appellate courts. A recent expression is that by Chief Judge Denman in Davena v. United States, 9 Cir., 1952, 198 F.2d 230, 231, certiorari denied, 1952, 344 U.S. 878, 73 S.Ct. 168, 97 L.Ed. 680:

"It is now urged upon us that these extra-judicial statements of the defendant were improperly admitted into evidence because the crime was not proved independently of them, and thus that United States v. Fenwick, 7 Cir., 177 F.2d 488 requires a reversal. Whatever vitality the Fenwick case has in the light of United States v. Hornstein, 7 Cir., 176 F.2d 217 which preceded it and appears to be in conflict, and United States v. Yeoman-Henderson, Inc., 7 Cir., 193 F.2d 867, which strictly limits the Fenwick case, *it is of no relevance in this circuit since here it is established that the evidence corroborating a confession of the defendant need not independently prove the commission of the crime charged, neither beyond a reasonable doubt nor by a preponderance of proof.*" (Emphasis supplied.)

This view has received distinguished support elsewhere. After stating the older and narrower view that the corpus delicti must be established independently of the confession, Judge Learned Hand, in Daeche v. United States, 2 Cir., 1918, 250 F. 566, 571–572, commented:

"But such is not the more general rule, which we are free to follow, and under which any corroborating circumstances will serve which in the judge's opinion go to fortify the truth of the confession. Independently *they need not establish the truth of the corpus delicti at all, neither beyond a reasonable doubt nor by a preponderance of proof.*

[Many cases cited.]" (Emphasis supplied.) [7]

The appellant vigorously rejects the authority of confession cases in perjury prosecutions, arguing that "where the evidence emanates directly from the defendant the rule generally applied in perjury cases has been relaxed". While it is true that a defendant's own confession is usually more impressive than the accusatory testimony of a disinterested witness, the difference goes merely to the *weight* of the two types of evidence and not to the *legal sufficiency* of the corroboration.

At any rate, the short answer to the appellant's objection is that, as we have seen, the Supreme Court has recognized the cognation between corroboration in confession cases and corroboration in perjury prosecutions. In *neither* case need the corpus delicti be proved by the corroboration, independently of the confession or of the testimony of the single accusing witness.

While vehemently insisting upon the necessity of corroboration in a perjury case, the appellant is extremely hypercritical of the appellee's efforts to satisfy that necessity. For instance, two specified errors are that the court below admitted the testimony of Whitted and Mrs. Heller, it being asserted that these witnesses were "permitted to testify as to transactions and conversations with the appellant completely unrelated in time or event to the transactions involved in the alleged perjurious statement," etc.

We know of no such rigid limitation of time or place in connection with the evidence of corroboration, so long as the factual relation is logical and reasonable. The authorities agree that the corroborative evidence need only "tend" to show that the defendant is guilty of perjury.[8]

We have already set out a summary of the testimony in the instant case. We believe that there was sufficient evidence, both oral and documentary, to corroborate Baskin's testimony, and we so hold.

### 4. Heller's Business Records Were Admissible

The appellant complains that the District Court erred in admitting certain of Heller's business records in evidence. One of these records was a book containing a running account of the bets made during the day, in which book Baskin saw Heller make entries, although Baskin did not "prepare" the daily book record and was not the custodian of the books. Whitted testified that he had seen Heller make entries in the book in question, and that it was in Heller's handwriting. Similar testimony was given by Mrs. Heller.

Another book was an exemplar of "certain business records" kept by Heller, in which Whitted testified that "all the bets that came in" were recorded. Mrs. Heller testified that she had seen her husband prepare records of that sort, and that it was in his handwriting.

Two other exhibits consisted of books

---

7. See also Pearlman v. United States, 9 Cir., 1926, 10 F.2d 460, 462; Wynkoop v. United States, 9 Cir., 1927, 22 F.2d 799; Aplin v. United States, 9 Cir., 1930, 41 F.2d 495, 496; Wiggins v. United States, 9 Cir., 1933, 64 F.2d 950, 952, certiorari denied, 1933, 290 U.S. 657, 54 S.Ct. 72, 78 L.Ed. 569; Chevillard v. United States, 9 Cir., 1946, 155 F.2d 929, 935; Adolfson v. United States, 9 Cir., 1947, 159 F.2d 883, 887–888, certiorari denied 1947, 331 U.S. 818, 67 S.Ct. 1307, 91 L. Ed. 1836; Iva Ikuko Toguri D'Aquino v. United States, 9 Cir., 1951, 192 F.2d 338, 357, certiorari denied, 1952, 343 U.S. 935, 72 S.Ct. 772, 96 L.Ed. 1343; rehearing

denied, 1952, 343 U.S. 958, 72 S.Ct. 1053, 96 L.Ed. 1358; motion for leave to file a second petition for rehearing denied, 1953, 345 U.S. 931, 73 S.Ct. 786, 97 L.Ed. 1361; Oldstein v. United States, 10 Cir., 1938, 99 F.2d 305, 306.

8. See also Miranda v. United States, 9 Cir., 1952, 196 F.2d 408, 411, certiorari denied, 1952, 344 U.S. 842, 73 S.Ct. 55, 97 L.Ed. 655; McWhorter v. United States, 5 Cir., 1952, 193 F.2d 982, 985; United States v. Nessanbaum, 3 Cir., 1953, 205 F.2d 93, 95, note 4, and United States v. Neff, 3 Cir., 1954, 212 F.2d 297, 307, heavily relied upon by the appellant.

of check stubs, which Mrs. Heller identified as business records of Heller's. Three exhibits were checks in Heller's handwriting and were identified by Mrs. Heller.

One exhibit consisted of "two blue sheets of paper" containing "Heller's handwriting on the inside and (Whitted's) handwriting on the outside". Whitted's writing on these papers or "tickets" was intended to represent "Whether the tickets were winning tickets or losing tickets, and to (the?) total amount of money that was—the man won or lost". They were admitted for the "limited purpose" of showing that the appellant was sometimes referred to as "J.A." and sometimes as "Jimmy A."

Exhibit No. 10 consisted of the five "parlay cards" already mentioned, which showed that the appellant had won $7900 on October 26, 1946. The final exhibit objected to is the excerpt of the appellant's testimony before the Grand Jury, in which, as we have seen, the appellant denied any knowledge of the five cards, etc.

So far as the admissibility of the various business records is concerned, 28 U.S.C.A. § 1732(a) is applicable:

"§ *1732. Record made in regular course of business; photographic copies*

"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

Construing a predecessor statute almost identical in language, in all pertinent respects, to the one at bar, the Court in Harper v. United States, 8 Cir., 1944, 143 F.2d 795, 806, used the following language:

"The purpose and effect of this statute is to make admissible any writing if made in the regular course of any business without the strict proof of authenticity which had theretofore been required." [9]

■ With regard to Mrs. Heller's testimony "as to the meaning of initials, figures, dates and symbols contained" in certain exhibits—concerning which testimony the appellant complains—it has been generally held that persons familiar with given types of documents may testify as to the meaning of symbols and abbreviations used in such documents. Meyer v. Everett Pulp & Paper Co., 9 Cir., 1912, 193 F. 857, 862, 100 A.L.R. 1465–1466.

Finally, as we have seen, Baskin, Whitted, and Mrs. Heller all testified regarding the manner in which Heller's books were kept. All three knew his handwriting.

■ The question of whether the authenticity of a document has been sufficiently proved prima facie to justify its admission in evidence rests in the sound discretion of the trial judge. Lewis v. United States, 9 Cir., 1930, 38 F.2d 406, 416. We cannot say that in the instant case there was an abuse of discretion.

---

9. See also Wheeler v. United States, 1953, 93 U.S.App.D.C. 159, 211 F.2d 19, 23, certiorari denied, 1954, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140.

**236**

■ We hold that Heller's business records were properly admitted.

**5.** *The Indictment Was Not Duplicitous*

The appellant maintains that the first count of the indictment charges "two or more offenses". He does not seem to be able to make up his mind as to how many offenses are thus charged. In his main brief, he counts "five separate offenses". In his reply memorandum, he trims it down to four.

■ As a matter of fact, the appellant is mistaken in both figures. The indictment charges only *one* offense. True, several searching queries were asked of the appellant during the Grand Jury investigation, but they were all ancillary to the $64 question—or, rather, the $38,000 question; namely, did Baskin hand him the thirty-eight one-thousand-dollar bills that Baskin had just obtained from the teller? The minor questions were all directed toward refreshing the appellant's recollection, so that there could be no mistake as to the deliberateness of his lie that he had not received the money.

In Cornes v. United States, 9 Cir., 1941, 119 F.2d 127, 129, we said:

> "Each of the first five counts charged the devising of a single scheme, not two schemes as contended by appellant. True, the scheme contemplated the commission of more than one act, but that did not convert it into two or more schemes or make either of the counts duplicitous. [Case cited.]"

■ The rule is thus stated in 2 Wharton's Criminal Law, 12th ed., 1932 (Ruppenthal), Sec. 1567, p. 1826:

> "*Several assignments may be incorporated in one count.* All the several particulars, in which the prisoner swore falsely, may be embraced in one count, and proof of the

falsity of any one will sustain the count." [10]

**6.** *The Instructions of the District Court Were Adequate*

The appellant objects that the trial court failed to give certain requested instructions and also that it gave one erroneous instruction. All the instructions referred to dealt with corroboration.

■ One requested instruction contains the statement that the corroborating evidence must be "inconsistent with the innocence of the defendant". We have already seen that the weight of authority is opposed to so severe a standard for the corroborating evidence. It is sufficient if the corroborating evidence *tends* to establish the defendant's guilt, and if such evidence *together with* the direct evidence is "inconsistent with the innocence of the defendant".

■ Another refused instruction asserts that the corroborative evidence "must be equally strong and convincing as the direct testimony which would be regarded as sufficient proof". We have already pointed out that this is tantamount to demanding that the appellee prove its case twice. Such proof is not required by law.

■ The third requested instruction that the court below declined to give verbatim specified that in the evidence of similar acts was included evidence of "acts and declarations and exhibits relating to the transactions of the defendant other than those covered by the statements alleged in the indictment to have been made under oath by the defendant". As we shall see in a moment, the instructions as given referred generally to "evidence" of similar acts, without spelling out the various possible *forms* or *types* in which such evidence might be found. Clearly, the lack of such particularization does not constitute error.

Finally, the appellant complains that

---

10. See also Hovley v. United States, 9 Cir., 1922, 277 F. 788, 790; Greenbaum v. United States, 9 Cir., 1935, 80 F.2d 113, 116; United States v. Crummer, 10 Cir., 1945, 151 F.2d 958, 963–964, certiorari denied, 1946, 327 U.S. 785, 66 S.Ct. 704, 90 L.Ed. 1012; United States v. Coen, D. C.La.1947, 72 F.Supp. 10, 12.

a certain given instruction, italicized below, "leaves the impression that anything the witness who testified directly to—if anything she says is corroborated, that alone is enough". The appellant insists that "if the corroboration is to something that is not as to the actual falsity of the thing he is accused of, that is not adequate corroboration, * * * "

As we have seen, the Supreme Court has repeatedly held that, with regard to either the quantum or quality of corroboration, the rule "does not relate to the kind or amount of other evidence required * * *." Hammer v. United States, supra, 271 U.S. at page 627, 46 S.Ct. at page 604, 70 L.Ed. 1118. Needless to say, this does not refer to corroboration as to trivia; neither does the context of the instruction as given so indicate.

The charge of the District Judge on the subject of corroboration and evidence of similar acts follows in full:

"The uncorroborated testimony of one witness is not enough to establish the falsity of the testimony of the defendant. The falsity must be evidence (sic) by the testimony of two independent witnesses, or by one witness and corroborating evidence. In the absence of such proof the defendant must be acquitted.

"*By corroborative evidence is meant evidence independent of the testimony of a single witness under oath which substantiates the testimony of that witness. That evidence must be trustworthy. A document such as a bank record or check or business record may constitute corroboration, if you find that it substantiates the testimony of the witness who testified directly as to the falsity of the defendant's statement and is trustworthy.*

"The trustworthiness of the corroborative evidence is for you to determine.

"Now, the Court permitted evidence from which you could find that the defendant made false statements to the Grand Jury other than the false statements contained in the indictment. Such evidence, if believed by you, is to be considered by you only insofar as you may find it bears upon or relates to the intent or wilfulness of the defendant with respect to the false statements charged in the indictment.

"You are not to consider the evidence of other false statements made by the defendant to the Grand Jury, if they are found to be false by you, unless you find beyond a reasonable doubt that the defendant made the statements charged in the indictment and that the falsity of those statements was proved in the manner which I have heretofore instructed you is required. It is not to be otherwise considered by you." (Emphasis supplied.)

Taking this charge by its four corners and considering it as a whole—as we must—we find that it is adequate and exhibits no reversible error.

### 7. *Conclusion*

We have carefully considered the elaborate specification of errors—inaccurately denominated "specifications of error"—compiled by industrious and resourceful counsel. We find nothing in it or in the able supporting briefs that warrants a reversal.

The appellant's guilt is plain. Baskin's accusatory testimony was straightforward and unequivocal on direct examination, and was unshaken on cross. As we have seen, the corroboration, both oral and documentary, was ample.

"A false witness shall not be unpunished." [11]

The judgment is affirmed.

11. Prov. 19:9.