**UNITED STATES of America,**
**Appellee,**

v.

**Roberto FLORES–RODRIGUEZ,**
**Defendant-Appellant.**

**No. 395, Docket 24097.**

United States Court of Appeals
Second Circuit.

Argued June 8, 1956.
Decided Oct. 1, 1956.

Paul W. Williams, U. S. Atty., for the Southern Dist. of New York, New York City (Jerome J. Londin, Asst. U. S. Atty., New York City, of counsel), for appellee.

Marchetti & Ehrlich, New York City (Joseph A. Marchetti, New York City, of counsel), for defendant-appellant.

Before FRANK, HINCKS and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

A one count indictment charged that, in violation of 22 U.S.C.A. § 1203 and 18 U.S.C. § 1621, defendant committed perjury by falsely stating in a signed and sworn Application for Immigration Visa and Alien Registration in Havana, Cuba that he had not been arrested or indicted for or convicted of any offense.

The defendant waived trial by jury and was tried before Judge Cashin. After trial, defendant moved for a judgment of acquittal. The judge denied the motion, found defendant guilty, and entered a judgment of conviction, sentencing defendant to a term of six months' imprisonment. Defendant appeals.

There was evidence at the trial of the following facts: On June 29, 1949, defendant, a citizen of Cuba, was admitted to the United States as a 29-day visitor. He returned to Cuba on July 27, 1949. Defendant next entered the United States on July 28, 1950, again as a 29-day visitor. Fifty-one days later, on September 17, 1950, or 22 days after he was supposed to have left the United States, defendant was arrested by an officer of the New York City Police De-

partment for a violation of Section 722 (8), New York Penal Law, McK.Consol. Laws, c. 40, which provides:

"§ 722. Disorderly conduct: "Any person who with intent to provoke a breach of the peace, or whereby a breach of the peace may be occasioned, commits any of the following acts shall be deemed to have committed the offense of disorderly conduct * * *

"8. Frequents or loiters about any public place soliciting men for the purpose of committing a crime against nature or other lewdness".

The arresting officer's sworn complaint stated in part:

"* * * On September 17, 1950 at men's toilet at Duffy Square, 47th Street and 7th Avenue, and vicinity (about 5:30 P.M.) * * * the Defendant did loiter for the purposé of inducing others to commit lewd and indecent acts, from about 5 to 5:30 o'clock P.M. did move from one urinal to several others, did manipulate the exposed and naked parts of his person, to wit, his penis, to the view of others, and did motion with his head in the direction of deponent and several others in said toilet."

Defendant was tried in the City Magistrate's Court of New York City on September 18, 1950 and found guilty. On September 25, 1950 he was sentenced to 30 days. The execution of the sentence was suspended and defendant was permitted to return to Cuba. On November 7, 1952, defendant presented himself at the American Consulate in Havana, Cuba, and there executed an Application for Immigration Visa and Alien Registration in order to obtain permanent admission to the United States. In this application defendant stated "* * * I have not been arrested or indicted for, or convicted of, any offense * * *" The application was subscribed and sworn to before a Vice-Consul of the United States of America, in Cuba, on November 7, 1952. It was then visaed by the Vice-Consul

and became an immigration visa. Defendant, using this visa, entered the United States on November 19, 1952, as one properly qualified to remain here as a permanent resident of this country.

Subsequent to his admission as a permanent resident, defendant was again charged with violating Section 722, subdivision 8, New York State Penal Law, was arrested, and following a plea of guilty on July 21, 1954, was sentenced to another 30 days.

Defendant contends that the United States failed to present sufficient evidence to prove him guilty of the crime of perjury. He contends that the following elements of the crime were not established: the authority of the Vice-Consul to administer the oath, the identity of Defendant as the person making the sworn statement, the falsity of the statement, knowledge of defendant that the statement was false, and the materiality of the statement to the issue of defendant's admissibility into the United States. We do not agree with defendant's contentions.

■ The competence of the Vice-Consul to administer the oath and the authorization for the oath are established as a matter of law by 22 U.S.C.A. § 1203 and former 8 U.S.C. § 207(f) (1946 Ed.) (now 8 U.S.C.A. § 1202(e).

■ Defendant's identity as the person who took the oath and executed the sworn statement was satisfactorily established by documentary evidence and oral testimony.

■ Defendant invoked the well-known rule that the falsity of a statement charged to be perjurious must be established by two witnesses, or by one witness supported by independent evidence. Hammer v. United States, 1926, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118. This rule, it must be remembered, deals with the falsity of the oath and not with its making. United States v. Nessanbaum, 3 Cir., 1953, 205 F.2d 93; United States v. Hall, D.C.Ga.1890, 44 F. 864, 10 L.R.A. 324.

It does not apply where the falsity of the oath is established by documentary evidence or written testimony springing from the Defendant or by a public record known to the Defendant when he took the oath. United States v. Wood, 1840, 14 Pet. 430, 39 U.S. 430, 10 L.Ed. 527. See generally, Arena v. United States, 9 Cir., 1955, 226 F.2d 227, certiorari denied, 1956, 350 U.S. 954, 76 S.Ct. 342.

■■ The case at bar is clearly within the foregoing exceptions. Not only was the falsity of the oath established by the certified copy of the records of defendant's first arrest, trial and conviction in New York, but also by defendant's own signed and sworn statement to Immigration officials on the occasion of his leaving the country in 1950. It has been held that a conviction of perjury for denying previous crimes can be sustained on the production of the record of a prior conviction without more. Holy v. United States, 7 Cir., 1921, 278 F. 521. So too can the falsity of the oath be established by an extra-judicial admission made prior to the making of the false statement. United States v. Buckner, 2 Cir., 1941, 118 F.2d 468; See Warszower v. United States, 1941, 312 U.S. 342, 61 S.Ct. 603, 85 L.Ed. 876.

■ Defendant argues that he could not cope with the English language, and that the United States failed to prove that he knew the statement was false. We are satisfied with the sufficiency of the evidence to support the trial court's finding to the contrary.

■ Defendant's final contention is that his false statement was not material, because even if he had told the truth, the vice-consul would have been obliged to issue the visa under the existing Immigration law. We are unwilling to believe the vice-consul is so helpless, and we think that defendant's false statement was material if a truthful answer might have induced the vice-consul to institute an investigation which might have resulted in a proper refusal of the visa. United States ex rel. Jankowski v.

Shaughnessy, 2 Cir., 1951, 186 F.2d 580; United States ex rel. Fink v. Reimer, 2 Cir., 1938, 96 F.2d 217.

The vice-consul should not have issued an immigration visa to the defendant if the defendant was within an excluded class of aliens under the statute then in force, 8 U.S.C.A. § 136 (1946 Ed.),* the pertinent parts of which read as follows:

"The following classes of aliens shall be excluded from admission into the United States:

"(a) All idiots, imbeciles, feeble-minded persons, epileptics, insane persons; persons who have had one or more attacks of insanity at any time previously; persons of constitutional psychopathic inferiority; persons with chronic alcoholism—

\*    \*    \*    \*    \*

"(d) Persons not comprehended within any of the classes enumerated in paragraphs a, b, or c, who are found to be and are certified by the examining surgeon as being mentally or physically defective, such physical defect being of a nature which may affect the ability of such alien to earn a living—

\*    \*    \*    \*    \*

"(e) Persons who have been convicted of or admit having committed a felony or other crime or misdemeanor involving moral turpitude: *Provided,* That nothing in sections 136 or 137 of this title shall exclude, if otherwise admissible, persons convicted, or who admit the commission, or who teach or advocate the commission of an offense purely political—"

We hold that by the defendant's untrue answer to the question relating to any previous conviction the vice-consul was not put on notice to investigate, and we think an investigation could have proved that the immigrant was within one of the excluded classes above set forth.

Under subsection (e) defendant was excludable if he had been convicted of a "crime or misdemeanor" "involving moral turpitude". Under the New York law the disorderly conduct for which defendant was convicted is denominated an "offense" and is called neither a "crime" nor a "misdemeanor." The New York Courts have adjudicated upon this difference in nomenclature and have held that this "offense" of disorderly conduct is indeed neither a "crime" nor a "misdemeanor." People v. Gilbert, Sp.Sess. 1939, 12 N.Y.S.2d 632; People v. Montgomery, Co.Ct.1940, 17 N.Y.S.2d 71; but cf. People v. French, 1886, 102 N.Y. 583, 7 N.E. 913. It would appear that these decisions were prompted in order to define the jurisdiction of the inferior magistrates' courts as opposed to other courts dealing with criminal conduct. Defendant therefore claims subsection (e) not applicable, and the government on appeal before us appeared to concur that this conviction for this "offense" though involving "moral turpitude" was not a "crime \* \* \* involving moral turpitude".

We cannot so readily concur, for such an all-inclusive commonly used word as the word "crime"[1] in an Act of Congress should not be necessarily circumscribed by restrictive holdings of the New York State Courts defining the jurisdictional limits of New York inferior

---

\* Now 8 U.S.C.A. § 1182.

1. See Webster's New International Dictionary (1927 Ed.) at Page 522 which defines the word "crime" as follows:

"1. An *omission of a duty commanded,* or the commission of an act forbidden, by a public law. The term crime is hardly a technical term at the common law, but is essentially defined in many of the penal codes in the United States, as in the New York code, as 'an act or omission forbidden by law and punishable upon convic-

tion by (1) death; or (2) imprisonment; or (3) fine; or (4) removal from office; or (5) disqualification to hold or enjoy any office of trust, honor or profit under the statute; or (6) other penal discipline.' A crime is a violation of a public right and may also involve a violation of the rights of an individual. *Crime includes all grades of public offenses,* which at the common law are often classified as treason, felony, and *misdemeanor.* \* \* \*"
(Italics the Court's.)

courts of criminal jurisdiction. Cf. Jerome v. United States, 1943, 318 U.S. 101, 63 S.Ct. 483, 87 L.Ed. 640, reversing, 2 Cir., 130 F.2d 514.

Congress has expressed its disapproval of the type of behavior for which defendant was convicted in New York. For example, under the District of Columbia Code, § 22–2701, defendant's misconduct would have been punishable as a misdemeanor. Kelly v. United States, 1952, 90 U.S.App.D.C. 125, 194 F.2d 150; Bicksler v. United States, D.C.Mun.App.1952, 90 A.2d 233. To hold that the peculiar New York definition of the word "crime" controls the interpretation of the Immigration Act would lead to an anomalous result: an alien convicted for the same misconduct as defendant in the District of Columbia or in many of the states [2] would be excludable under subsection (e); but because this misconduct is characterized as an "offense" and not a "crime" in New York defendant would not be so excludable. We do not believe Congress intended such a result. However, we do not need to resolve this case solely on this ground for we believe the defendant's lie was also clearly material in that it prevented investigation

of the possible applicability to him of subsections (a) and (d).

The government contended that defendant was excludable under subsection (a) as a person "of constitutional psychopathic inferiority". It offered no evidence whatever, nor any data to inform our judicial notice, to the effect that an homosexual who solicits unnatural acts in a public place comes within that category. However, the defendant put before us answers given by him under oath through a Spanish interpreter to a U. S. Immigration Inspector on January 14, 1955. These statements were later contradicted by him, also under oath, but on January 14, 1955 defendant stated that he was indeed an homosexual, that he had been practicing homosexuality all his life, and had engaged in such acts in the United States. If true, these facts might well have been discovered by a medical officer of our Public Health Service when defendant sought admission into the United States in 1952.[3] And, together with the fact of defendant's conviction which in itself was evidence of homosexual tendencies of an extremely offensive exhibitionistic nature,[4] these facts might have led to defendant's certification as a "constitutional physchopathic inferior." [5]

2. See e.g., Conn.Gen.Stat., 1949 Rev., §§ 8873, 8877, 8569, 8548; Iowa Code 1954, § 725.1, I.C.A.; Mass.G.L. c. 272, § 16; Rev.Stat. of N.J.1937, Title 2, c. 140–1, now N.J.S.A. 2A:115–1; Purdon's Pennsylvania Statutes Annotated, Title 18, § 4502; Vermont Statutes, Rev.1947, §§ 8480, 8611, 8615. See also State v. Wimer, 1918, 30 Del. 114, 103 A. 752; State v. Bauguess, 1898, 106 Iowa 107, 76 N.W. 508; Commonwealth v. Hamilton, 1931, 237 Ky. 682, 36 S.W.2d 342; Commonwealth v. Cummings, 1930, 273 Mass. 229, 173 N.E. 506. The particular kind of conduct involved here is variously defined in the criminal statutes as lewdness, indecent exposure, obscenity, disorderly conduct, or sodomy, and variously punishable as a "felony" or a "crime" or a "misdemeanor" or an "offense."

3. Former 8 U.S.C. § 102 (1946 ed.) now 8 U.S.C.A. § 1103 provides for the assignment of medical officers of the United States Public Health Service for the performance of duties in foreign countries in connection with the enforcement of the

immigration laws. The court is informed the medical officers have been assigned to Havana pursuant to this provision.

4. Exhibitionism is defined in Dorland's American Illustrated Medical Dictionary, 22nd ed., page 533 as follows: "the display of one's body or parts (even the genitals), for the purpose, conscious or unconscious, of attracting a sexual interest."

5. Myerson in *The Psychology of Mental Disorders* (1928) at Page 102 describes the development of this phraseology as follows: "The English invented the term, 'moral imbecile' to explain those individuals who go through life uninfluenced by punishment or social disapproval, and who do not, therefore, subordinate their egoism to the laws of society. Often mentally below par, they are not feeble-minded, and indeed may be of average, or even superior intelligence. The Germans changed the word to 'psychopathic personality,' and the Americans, to show their psychiatric insight added a milestone

We understand this little-understood and rarely interpreted phrase—presumably out of the psychology books—to characterize individuals who show a life-long and constitutional tendency not to conform to group customs, and who habitually misbehave so flagrantly that they are continually in trouble with authorities. See State ex rel. Pearson v. Probate Court, 205 Minn. 545, 287 N.W. 297, 300.[6] In our judgment the defendant on January 14, 1955 so characterized himself.

█ We think therefore, that it was a material untruth not to disclose the conviction that would have led to further inquiry respecting defendant's possible inclusion within this particular excludable class of aliens.

█ Under subsection (d), any alien is excludable from admission who is suffering from a mental abnormality of a serious degree, i. e. aliens "mentally defective," that cannot be classified as idiocy, imbecility, feeble-mindedness, epilepsy, insanity, constitutional psychopathic inferiority, or chronic alcoholism. The term "mentally defective," as used in the statute, is a concept embracing more than intellectual capacity or the lack thereof.[7] The statute in subsection (a) specifically provides for the exclusion of those lacking in intellectual capacity. Subsection (d) must have been designed to exclude a different group of would-be immigrants. We think this language was designed to exclude homosexuals with exhibitionistic tendencies and other groups with lewd proclivities similarly repugnant to the mores of our society.

to progress by coining the label 'constitutional inferior.' The fact is that here we tread a dangerous path, for it is difficult to separate out what is *constitutional* disease or defect in this condition from what is perhaps conveniently called acquired viciousness. The habitual criminal may be a constitutional inferior, but we get nowhere if we merely substitute one term for another. If a person from his earliest days lies continually and often fantastically, if he chooses deliberately despite a normal environment and training, to shun work of a steady kind and chooses instead crime, if he becomes a drug habitué, and is subject to temperamental manifestations of a bizarre kind, we need not absolve him from punishment as irresponsible, for we are not, as psychiatrists, at the place where our knowledge is definite concerning him. We may simply state that he lacks the social instinct, at least comparatively, and after his history has become that of a definite repeated offender, we may urge on society the need of permanent segregation." Abraham Myerson, M.D., The Macmillan Company (1928).

6. The Minnesota Supreme Court was construing the term "psychopathic personality" as it appears in Minn.Laws 1939 C. 369, which provides for the care and commitment of dangerous sexually irresponsible persons. The Court quotes Draper, "Mental Abnormality in Relation to Crime," 2 Am.Jour.Med.Jur., No. 3, Page 163 as follows: "Psychopathic personalities are individuals who show a life-long and constitutional tendency not to conform to the customs of the group. They habitually misbehave. They have no sense of responsibility to their fellow-men or to society as a whole. Due to their inherent inability to follow any one occupation, they succumb readily to the temptation of getting easy money through a life of crime. There is usually a history of delinquency in early life. These individuals fail to learn by experience. They are inadequate, incompatible, and inefficient. This class is sometimes designated as 'Constitutional Psychopathic Inferiority.' Before making this diagnosis, every other diagnostic possibility must be considered and excluded. In this group we see pathological lying, prostitution, vagrancy, illegitimacy, alcoholism and drug addiction. The term 'moral deficiency' is sometimes used to characterize this group. These patients may have psychotic episodes superimposed upon the trends just mentioned. Many of these individuals come in contact with the courts on account of threats, assaults, quarrels and vagrancy."

7. That the medical profession regards homosexuality as a mental disorder or defect is indicated by the American Medical Association's Standard Nomenclature of Diseases and Operations, where at page 91, under the division of "Psychogenic Disorders" (which are personality disorders originating in the mind), is a subdivision entitled "Sociopathic Personality Disturbance" under which are classified persons having the disorder of sexual deviation.

Defendant was convicted of having solicited men in a public place to commit with him an homosexual act. Such behavior is most emphatically not socially approved behavior in these United States. If defendant had not sworn falsely in his application to obtain the visa he needed to make him a permanent resident here, the vice-consul would have been warned of defendant's exhibitionistic anti-social proclivities. So warned, the vice-consul undoubtedly would have required a medical examination of defendant by a U. S. Public Health Service physician in Cuba, and the physician upon such an examination might very well have certified defendant as mentally defective within the meaning of subsection (d).

Finally, a sex deviate so afflicted with such a defect of mentality as to publicly solicit an unnatural act is very likely to be brought into repeated conflict with our social customs, constituted authority, and social environment. He will find it extremely difficult to adapt himself, and to become a useful member of the American community.

It cannot be supposed that Congress did not intend to include such undesirables within the excluded classes of immigrants listed in subsections (a), (d) and (e) of Section 156 of Title 8 of U.S. C.A. (1946 Ed.);† and that it was the Congressional intent that they should be freely admissible here.

We therefore hold that the defendant's false oath was material because it choked off a line of investigation which well might have resulted in his valid exclusion from the United States; and that all the elements required to prove the crime of perjury by him were proved.

The judgment is affirmed.

---

† Now 8 U.S.C.A. §§ 1251–1253.

1. The 1952 Act, 8 U.S.C.A. § 1182, provides for the exclusion, *inter alia*, of the following classes of aliens:
   "(1) Aliens who are feeble-minded;
   "(2) Aliens who are insane;
   "(3) Aliens who have had one or more attacks of insanity;

FRANK, Circuit Judge (concurring).

1. I agree with the first reason given by my colleagues, i. e., that this defendant was guilty because he knowingly and deliberately failed to state that he had been convicted of an offense, since that offense constituted a "crime or misdemeanor involving moral turpitude".

2. As that reason alone suffices to dispose of this appeal, I think we ought to stop there. I think it a mistake for my colleagues needlessly to embark—without a pilot, rudder, compass or radar—on an amateur's voyage on the fog-enshrouded sea of psychiatry. The unnecessary voyage ends, as I think it was bound to, in a dubious conclusion: My colleagues (sans legislative history or extensive research into psychiatric writings) solemnly declare what Congress intended when, in the 1917 statute, it adapted psychiatric terminology in the phrases "constitutional psychopathic inferiority" and "mentally defective." It is those phrases which, if they apply at all, must be applied here, and not the psychiatric terms found in the 1952 Act, which was not in effect when defendant gave his answers.

The 1952 Act for the first time used the term "psychopathic personality" which it substituted for the phrase "constitutional psychopathic inferiority" in the earlier statute.[1] We have the legislative history of the 1952 Act which makes it plain that, in that legislation, Congress deliberately adopted definitions, contained in a 1952 report of the Public Health Service, of the terms of the 1952 Act. According to those Public Health Service definitions (which many psychiatrists would not accept), "psychopathic personality" and "mental defect" seem to include homosexuality or sexual perversion, regardless of whether such proclivities are "constitutional"[2]—a word

---

"(4) Aliens afflicted with psychopathic personality, epilepsy, or a mental defect".

2. The Senate Report No. 1137, 82d Cong., 2d Session (1952) stated: "Existing law does not specifically provide for the exclusion of homosexuals and sex perverts. The provisions of S. 716 which specifically excluded homosexuals and sex perverts as

which means what one is born with.[3]

We have no legislative history of the 1917 statute to help us interpret its pertinent language. Recognizing that fact, the government in its brief asks us to read into the 1917 Act the definitions— which Congress adopted 35 years later— of the new language of the 1952 Act.

This, of course, we cannot do. Consequently, to construe the 1917 terms— "constitutional psychopathic inferiority" and "mentally defective"—to include homosexuality or the like, we would need most convincing and reliable data (to inform our judicial notice) as of the date of that legislation. We have none.[4]

a separate excludable class does not appear in the instant bill. The Public Health Service has advised that the provision for the exclusion of aliens afflicted with psychopathic personality or a mental defect which appears in the instant bill is sufficiently broad to provide for the exclusion of homosexuals and sex perverts. This change of nomenclature is not to be construed in any way as modifying the intent to exclude all aliens who are sexual deviates."

The advice of the Public Health Service mentioned in this Report refers to a "Report of the Public Health Service on the Medical Aspect of H.R. 2379." This report of the Public Health Service is set out in House of Representatives Report No. 1365, 82nd Congress, 2nd Session (1952), page 47; see U.S.Code Congressional and Administrative News, 82nd Congress, 2nd Session (1952), volume 2, pages 1653 et seq. On pages 1699 et seq. appears the Public Health Service Report. It states: " * * * The conditions classified within the group of psychopathic personalities are, in effect, disorders of the personality. They are characterized by developmental defects or pathological trends in the personality structure manifest by lifelong patterns of action or behavior, rather than of mental or emotional symptoms. Individuals with such a disorder may manifest a disturbance of intrinsic personality patterns, exaggerated personality trends, or are persons ill primarily in terms of society and the prevailing culture. The latter or sociopathic reactions are frequently symptomatic of a severe underlying neurosis or psychosis and frequently include those groups of individuals suffering from addiction or sexual deviation. * * *

"Sexual perverts. The language of the bill lists sexual perverts or homosexual persons as among those aliens to be excluded from admission to the United States. In some instances considerable difficulty may be encountered in substantiating a diagnosis of homosexuality or sexual perversion. In other instances where the action and behavior of the person is more obvious, as might be noted in the manner of dress (so-called transvestism or fetishism), the condition may

be more easily substantiated. Ordinarily, a history of homosexuality must be obtained from the individual, which he may successfully cover up. Some psychological tests may be helpful in uncovering homosexuality of which the individual, himself, may be unaware. At the present time there are no reliable laboratory tests which would be helpful in making a diagnosis. The detection of persons with more obvious sexual perversions is relatively simple. Considerable more difficulty may be encountered in uncovering the homosexual person. Ordinarily, persons suffering from disturbances in sexuality are included within the classification of 'psychopathic personality with pathologic sexuality.' This classification will specify such types of pathologic behavior as homosexuality or sexual perversion which includes sexual sadism, fetishism, transvestism, pedophilia, etc. In those instances where the disturbance in sexuality may be difficult to uncover, a more obvious disturbance in personality may be encountered which would warrant a classification of psychopathic personality or mental defect."

3. See, e.g., White, The Abnormal Personality (2d ed. 1956) 394. He says that the concept of psychopathic personality "originated with an English psychiatrist, Prichard, who in 1835 described a 'form of mental derangement' in which intellect seemed unimpaired but in which the 'power of self-government' was lost or lacking, so that the individual was incapable of 'conducting himself with decency and propriety in the business of life.' Prichard called such patients 'morally insane' or 'morally imbecile,' terms which still persist in British psychiatry. Toward the end of the century the hypothesis was advanced that people who answered the description given by Prichard probably suffered from some *hereditary weakness* of the nervous system; hence the term *constitutional* psychopathic inferiority."

And see the Public Health Service Circular, quoted infra. which explicitly states that "constitutional" means "present at birth."

4. I think that, before we attempted to interpret those words, we should at least have asked the government to assist us by

To obtain such data would be none too easy. But from what little reading of psychiatric writings I have done, I know just enough about psychiatry to know this: (a) No unanimity, even now, prevails among psychiatrists concerning the correct interpretation of the words in question, and the conflicting interpretations were much in flux when Congress enacted the old statute in 1917 and up to 1952 when it enacted the new.[5] (b) Certainly there was not in 1917 (and there is not now) any general agreement among psychiatrists that homosexuality and sexual perversion are characteristics with which a person is born.[6]

I think it unwise, in interpreting the 1917 Act, for my colleagues to rely on a Minnesota decision in 1939,[7] construing a 1939 Minnesota statute, Laws 1939, c. 369, § 1, M.S.A. § 526.09, which provided for the application to one having a "psychopathic personality" of that state's laws relating to insane persons. Not only did the statute say nothing of "constitutional psychopathic inferiority" but it specifically defined "psychopathic personality" to mean "the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of his acts, or a combination of any such conditions, as to render such person irresponsible for his conduct with respect to sexual matters and thereby dangerous to other persons." Nor do I think it wise for my colleagues to rely on quotations (without regard to con-

text) from the writings of two psychiatrists, published 11 and 22 years, respectively, after the enactment of the 1917 statute.[8] (When I say "without regard to context" I have in mind the following: Psychiatrists have differing perspectives when they are (a) classifying patients, (b) diagnosing patients with reference to possible "cure," and (c) discussing the legal "responsibility" of the those accused of crime. A psychiatrist with one perspective may use a psychiatric term in a manner different from another psychiatrist with another different perspective.) Such material supplies slimsy support for a decision holding (1) that in 1917 homosexuality was considered a "constitutional" component of "psychopathic inferiority," (2) that, when in 1952, Congress dropped "constitutional psychopathic inferiority" and substituted "psychopathic personality," it intended no change, so that the former means the same as the latter, and (3) that in the 1917 statute "mentally defective" included homosexuality and exhibitionism not present at birth.

Revelatory is a circular, distributed in 1951—i. e., before the 1952 Act—by the Public Health Service to its medical officers concerned with examining aliens under the 1917 statute.[9] The circular summarizes the "criteria" these officers were to apply. It states, "These criteria * * * are not * * * to be understood as legally effective interpretations of the statute"; and it notes that there are "instances in which the terminology of the Immigration Act of

filing additional briefs supplying us with such data as, by diligent research, it might discover. For neither in its filed briefs nor at oral argument, did the government furnish us with such material.

5. White, loc. cit. 395–396; cf. Guttmacher and Weihoffen, Psychiatry and the Law (1952) 86 ff.

6. See, e.g., White, loc. cit. 129, 407–409. Consider the fact that a culture's tolerance of homosexuality may foster it in many persons who had no such tendencies at birth. See excerpts from Westermarck, The Origin and Development of The Moral Ideas (1908) in Calverton, The Making of Man (1931) 529, especially

545–547. Think, for example, of the homosexuality of Plato and his associates; see, e.g., Fite, The Platonic Legend (1934) Ch. 8.

7. State ex rel. Pearson v. Probate Court, 205 Minn. 545, 287 N.W. 297. See also Minnesota ex rel. Pearson v. Probate Court, 309 U.S. 270, 60 S.Ct. 523, 84 L. Ed. 744.

8. The Myerson book was published in 1928, and the Draper article in 1939.

9. The circular was published in Interpreter Releases, Common Council for American Unity, Vol. XXVIII, No. 35, August 7, 1951.

1917 does not correspond with the standard nomenclature of modern medicine and psychiatry." With that preface, the circular states: "The statutory term 'constitutional psychopathic personality' has no exact counterpart in present medical or psychiatric terminology. However, with certain limitations the term 'psychopathic personality,' with its various subcategories, would seem to have the same meaning. In the classification of conditions under this category, the word 'constitutional' is important. This term implies that the psychopathic inferiority was present at birth. The medical examiner will, therefore, certify a condition as 'constitutional psychopathic inferiority' only where the condition or its symptoms were present and are traceable rather clearly back to the early years of the individual's existence and therefore can be considered to have been present at birth." So, according to this circular, "psychiatric personality" includes, and means much the same as, "psychopathic inferiority," and Congress, when it specifically provided for the exclusion of an alien with a "psychopathic personality" if it were "constitutional," meant such a personality present at birth. But the circular also states, "Individuals with psychopathic personality in whom it is impossible to demonstrate the constitutional nature of the symptoms are also certifiable (i. e., to be excluded) as mentally defective." See the curious result of this circular's interpretations:

(1) The statute specifically calls for the exclusion of an alien who was born with a "psychopathic personali-

ty" (i. e., "psychopathic inferiority").

(2) Yet an alien with a "psychopathic personality," whether or not present at birth, is to be excluded as "mentally defective," since "mentally defective" includes "psychopathic personality" (i. e., "psychopathic inferiority").

If, however, "mentally defective" includes every alien with a "psychopathic personality," regardless of whether or not he was born with it, why did Congress specifically require the exclusion of an alien whose "psychological personality" (i. e., "psychopathic inferiority") is "constitutional," i. e., goes back to his birth? Does not such an interpretation of "mentally defective" render purposeless, functionless, the use of the limiting word "constitutional"? As an interpretation with such an effect should be rejected,[10] does not the statute mean that an alien is not to be excluded unless his "psychopathic personality" (i. e., "psychopathic inferiority") is "constitutional"?

It would seem to me to follow (a) that "constitutional psychopathic inferiority," used in the old statute, is not at all the same as "psychopathic personality," first used in the 1952 statute, and (b) that "mentally defective" in the old statute cannot be stretched to cover a "psychopathic inferiority" which is not "constitutional." This analysis, I think, amply justifies the circular's prefatory warning that its interpretations "are not * * * to be understood as legally ef-

---

10. See, e.g., United States v. Menasche, 348 U.S. 528, 538-539, 75 S.Ct. 513, 99 L. Ed. 615; Aetna Casualty & Surety Co. v. Phoenix Nat. Bank & Trust Co., 285 U.S. 209, 52 S.Ct. 329, 76 L.Ed. 709; Ex parte Public National Bank of New York, 278 U.S. 101, 104, 49 S.Ct. 43, 73 L.Ed. 202; Market Co. v. Hoffman, 101 U.S. 112, 115-116, 25 L.Ed. 782; Platt v. Union Pacific Railroad Co., 99 U.S. 48, 58, 25 L.Ed. 424.

In Hill v. William, [1949] A.C. 530, 544, 546-547, Viscount Simon (at 546), in pointing out that seldom should tautol-

ogy be imputed to a legislature, said that "it is to be observed that though a Parliamentary enactment (like parliamentary eloquence) is capable of saying the same thing twice over without adding anything to what has already been said once, this repetition in the case of an Act of Parliament is not to be assumed. * * * The rule that a meaning should, if possible, be given to every word in the statute implies that, unless there is good reason to the contrary, the words add something which would not be there if the words were left out."

fective interpretations of the statute" as it stood before 1952. The same, I think, is true of my colleague's interpretations. For they construe the 1917 Act as if it were the 1952 Act, by applying the legislative history of the latter to the former.

We would smile (I trust indulgently) at psychiatrists who thought that most legal terms possess clear, precise, stable meanings, easily to be learned by thumbing a few judicial opinions and a legal dictionary. Why should we hope to escape the smiles of psychiatrists if we behave similarly *vis-à-vis* psychiatry? And why should we assume that psychiatrists have successfully overcome the semantic difficulties we and all other humans (except, perhaps, mathematicians) [11] have never surmounted?

11. We cannot be sure that even mathematicians have always escaped the perils of ambiguity. See Hadamard, The Psychology of Invention in the Mathematical Field (1945) Chapters 6–8.