MATTER OF S——

In DEPORTATION Proceedings

A-8364783

*Decided by Board July 21, 1959*

Excludability—Afflicted with psychopathic personality—Homosexual—Crime involving moral turpitude—Michigan—Gross indecency, section 338, Michigan Penal Code.

(1) A homosexual is within the class of persons afflicted with psychopathic personality as contemplated by section 212(a)(4) of the 1952 act when he has engaged in homosexual activities on many occasions over a period of time and his behavior is not a response to unusual circumstances such as an all male environment.

(2) Violation of section 338, Michigan Penal Code, gross indecency, held to involve moral turpitude despite absence of statutory definition of the crime.

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at time of entry as afflicted with psychopathic personality.

Lodged: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at time of entry as having admitted commission of crimes involving moral turpitude; namely, gross indecency and crime against nature (Michigan).

BEFORE THE BOARD

**Discussion:** Respondent is a 33-year-old unmarried male alien, a native and national of Canada, whose last entry into the United States was at Detroit, Michigan, on August 15, 1958, when he entered as a returning resident. Respondent was admitted for permanent residence at Detroit on August 27, 1952. The special inquiry officer found respondent not deportable on the charge stated in the order to show cause, but found him deportable on the lodged charge. The alien appeals from the special inquiry officer's decision, contesting the finding that he is deportable on the lodged charge.

The examining officer appeals from so much of the special inquiry officer's order as finds the respondent deportable on the lodged charge only, contesting the special inquiry officer's conclusion that the respondent is not subject to deportation under section 241(a)(1) of the Immigration and Nationality Act as a person afflicted with a psychopathic personality under section 212(a)(4) at time of

409

entry. It is the conclusion of the Board that the alien is deportable on both charges.

On April 12, 1958, respondent was arrested in Detroit for "accosting and soliciting" a male police officer to perform an unnatural sex act (oral perversion), in violation of section 448, Michigan Penal Code. On his plea of guilty, he was convicted and sentenced to pay a fine in lieu of a jail term. Thereafter on June 19, 1958, respondent made a sworn statement to an immigration investigator, following the usual warning that "any statement you make must be of your own free will and may be used as evidence in any deportation or other proceedings." The alien stated that he was willing to make the statement under oath. It is this statement (exh. 2) which forms the basis for the lodged charge.

Respondent was asked if he understands the meaning of the word homosexual, and he said, "Yes, I understand the meaning of the word, yes." He stated he had homosexual tendencies since he was 15 or 16 years of age and described the manner and nature of his indulgence. He stated that he had engaged in such acts with other male persons for "practically four years." He admitted frequenting locations known to be gathering places for homosexuals, admitted acts of sodomy, stated that he had engaged in such activities sometimes two or three times a month and sometimes not as often. The definitions of "gross indecency," section 338, and "sodomy," section 158, Public Acts of 1931, Michigan, were read to respondent, and he was asked if he admitted the commission of these crimes prior to his last entry into the United States on April 1, 1957. Respondent answered, "Yes," to each of these questions.

After the time of making the statement, respondent went to Canada with his father and mother and returned on August 15, 1958. An order to show cause dated October 31, 1958, was served on respondent, and the hearing was commenced on November 10, 1958. Respondent denied that he was afflicted with a psychopathic personality. He admitted that the sworn statement of June 19, 1958, was made by him and that all the information contained in the record of that statement was true and correct. He admitted having been interrogated by Dr. P——L——, M.D., Psychiatric Consultant of the United States Public Health Service. Dr. L—— issued a Class A medical certificate certifying that respondent was afflicted with "sociopathic personality disturbance, sexual deviation (homosexuality) (psychopathic personality with pathologic sexuality)" at the time of his last entry. Exhibit 2 and the medical certificate, exhibit 3, were introduced in evidence, and there was no objection by respondent or counsel.

At a continued hearing Dr. L—— testified that during his 45-minute interview with respondent the facts elicited by him were

sufficient to support the certificate he issued. He recited much the same information as that set forth in exhibit 2, but in greater detail. Counsel asked Dr. L—— on what he based his diagnosis of a psychopathic personality in the case of respondent, and Dr. L—— replied:

* * * the main piece of evidence * * * is the predominant homosexual interests that he clearly manifests and has manifested for a series of years. * * * In addition to this, * * * he was quite accepting of this kind of sexual adjustment and was generally speaking concerned largely with the legal consequences of his predicament rather than any moral or ethical or religious consequences of his adjustment and behavior.

Dr. L—— testified that he considered the time he spent with respondent sufficient for the purpose of immigration procedure. That is, he did not prescribe any treatment, and his examination was not for the purpose of planning treatment or for determining whether respondent could be successfully treated.

Dr. A——, a physician practicing psychiatry in Detroit, Michigan, and offering extensive qualifications, testified in respondent's behalf. He saw respondent nine or ten times in his office and testified that he had thoroughly examined respondent and had formulated a theory or concept of respondent's personality and condition, which he recited. Dr. A—— stated that from a psychiatric viewpoint he does not believe respondent to be a homosexual, but states that his diagnosis is "psychosexual infantilism." Dr. A—— testified that respondent indulged in the "infantile sexual life" only when he was under the influence of alcohol which relieved him of his inhibitions. Dr. A—— was asked by the examining officer, "Did this respondent relate to you a history of homosexual conduct?" Dr. A—— replied in the affirmative and read from his notes a resume of respondent's background, including the fact that his first "experience" was in 1954; that he had engaged in such activities about once a month since that time, both as the active and passive partner; and that he claims to have been under the influence of alcohol on every occasion that he engaged in active homosexuality. Dr. A—— stated that he diagnoses respondent as a neurotic rather than a psychopathic personality, and as a person afflicted with psychosexual infantilism rather than as a homosexual, because he has anxieties, fears and concerns about himself, because he desires to cure himself, and because he has actually entered into a relationship with a woman. In Dr. A——'s terminology, a psychopath has no such desires and seeks no such help. Dr. A—— also testified that in all of these incidents respondent was "lured," and that definitely in the circumstance of the last arrest "luring" had been present.

The psychiatrist ranged over a wide area of hypothetical unrelated to the instant case. The hearing became primarily a discussion of the legal meaning of the term "psychopathic personality."

411

Dr. L—— was asked to define a psychopathic personality, and replied:

I believe the term "psychopathic personality" is essentially a descriptive term referring to individuals who manifest poor judgment, inability to learn from experience, antisocial and dissocial trends in their life pattern, lack of adherence to the usual social and moral standards * * * does not follow, generally speaking, the usual moral and social code * * * although this same person is fully cognizant of the nature of his activities and he is fully responsible for them in the sense that he knows what he is doing and the consequences of his acts.

The term "psychopathic personality" is defined for us in the legislative history of the statute and in the Manual for Medical Examination of Aliens, issued by the United States Department of Health, Education, and Welfare, Public Health Service, Washington, D.C., chapter 6, Mental Diseases and Defects, which states, section A, p. 6-1:

1. *General.*

a. The purpose of this section is to take up separately various excludable (class A) mental conditions with the object of clarifying the meanings of the terms, and to furnish criteria that will help the examiner determine the proper classification of mental conditions according to the terms contained in the law and regulations.

b. A description of the various types of mental illness will be found in the Diagnostic and Statistical Manual, Mental Disorders (Committee on Nomenclature and Statistics, American Psychiatric Ass'n., Washington, D.C., 1952.) * * *.

\* \* \* \* \* \* \*

6. *Psychopathic personality.*

a. The legal term "psychopathic personality" is equivalent to the medical designation "personality disorder," which may be broadly defined as follows: "These disorders are characterized by developmental defects or pathological trends in the personality structure, with minimal subjective anxiety and little or no distress. In most instances, the disorder is manifested by a lifelong pattern of action or behavior (acting out), rather than by mental or emotional symptoms." * * *

b. Under this legal category will be classified those applicants who are diagnosed as sexual deviates. (p. 6-5)

The Senate Committee Report No. 1137 (82d Cong., 2d sess., January 29, 1952) reporting for the Committee on the Judiciary on the bill which became the Immigration and Nationality Act of 1952 comments:

Existing law does not specifically provide for the exclusion of homosexuals and sex perverts. The provisions of S. 716 which specifically excluded homosexuals and sex perverts as a separate excludable class does not appear in the instant bill. The Public Health Service has advised that the provision for the exclusion of aliens afflicted with psychopathic personality or a mental defect which appears in the instant bill is sufficiently broad to provide for the exclusion of homosexuals and sex perverts. *This change of nomenclature is not to be construed in any way as modifying the intent to exclude all aliens who are sexual deviates.* (Emphasis supplied.)

412

The House Committee on the Judiciary submitted Report No. 1365 (82d Cong., 2d sess., February 14, 1952) which includes at page 46 the report of the Public Health Service on the medical aspects of this legislation. The latter report discusses the term "psychopathic personality" as follows:

Some comments should be expressed regarding the term "psychopathic personality." Although the term "psychopathic personality," used in classifying certain types of mental disorders, is vague and indefinite, no more appropriate expression can be suggested at this time. The conditions classified within the group of psychopathic personalities are, in effect, disorders of the personality. They are characterized by developmental defects or pathological trends in the personality structure manifest by lifelong patterns of action or behavior, rather than by mental or emotional symptoms. Individuals with such a disorder may manifest a disturbance of intrinsic personality patterns, exaggerated personality trends, or are persons ill primarily in terms of society and the prevailing culture. The latter or sociopathic reactions are frequently symptomatic of a severe underlying neurosis or psychosis and frequently include those groups of individuals suffering from addiction or sexual deviation. Until a more definitive expression can be devised, the term "psychopathic personality" should be retained.

We are, of course, bound by the definition of psychopathic personality in the 1952 act, as it appears in the legislative history and the Manual for the Medical Examination of Aliens, as set forth above. Dr. A—— described what he considered to be a psychopathic personality, but it is clear that his definition is different from that decreed for us by the authorities quoted above.

The special inquiry officer read to Dr. A—— from House Report No. 1365, quoting the Public Health Service definition of "psychopathic personality" and asked whether Dr. A—— agreed with this discussion and concept. Dr. A—— replied that he did not entirely agree with it, that "in the light of clinical experiences, you cannot make a universal conclusion, so to speak. You have to treat each case individually and not in the form of a statistic. * * * We want to put them into definitions, into classes, and into laws * * *, and when we deal with human beings, it's impossible * * * if we keep in mind the quantitative factor, then we can understand whether or not he approximates the degree of what in the old times they used to call psychopathic personality, or the degrees of what I choose to term psychosexual infantilism." Dr. A—— came around to stating that he disagreed with the terminology of the Act and prefers to use a term of his own, "psychosexual infantilism." The term psychopathic personality used in the Act, and defined for us in the legislative history of the Act, is not one we can use or reject, or substitute a term we prefer. If we were to accept Dr. A——'s definition of the term it seems apparent that almost no one would be classified as a psychopathic personality, because his definition contemplates a person who is incurable and refuses to seek treat-

ment. If one has refused to seek treatment, it is impossible to say he is incurable. Only a person who had submitted to extensive treatment and had not benefited thereby would come within Dr. A——'s definition. It is our opinion that the application of the law was not intended to be so narrowed. The definition of psychopathic personality offered by Dr. L—— was more nearly akin to the standard prescribed by the law and the legislative history of the law.

A difference of opinion also exists between Dr. L—— and Dr. A—— as to the definition of a homosexual. Dr. L—— stated that it is a difficult thing to define, that no single distinction allows people to be characterized into two groups, one being heterosexual or normal and the other being homosexual or abnormal, but that, to the best of his ability, "Homosexuals are those individuals who manifest characteristically a preference both in their overt sexual activity and in their mental or psychic sexual fantasies * * * a preference for the same sex. * * * According to the Manual for Medical Examination of Aliens and the nomenclature of the American Psychiatric Association, most homosexuals would be considered as sociopathic personalities with sexual deviation. I couldn't say categorically that all homosexuals would fall in this category because I haven't seen all homosexuals. I'm sure there might be some exceptions." Dr. L—— stated that a homosexual who might not be a psychopathic personality might be one who had occasional or isolated homosexual experience, or who responded with homosexual behavior when he was in an all male environment such as the Army or in prison. He denied, in response to a question of counsel, that there was any similarity between such situations and a hypothetical situation posed by counsel where "an arresting officer makes himself available by means of what we have legally defined as an entrapment." Dr. L—— also stated that he does not feel that there is any such thing as a psychoneurosis causing homosexuality.

The meaning of "homosexual" is discussed in *United States* v. *Flores-Rodriguez*, 237 F.2d 405 (C.A. 2, 1956), although the case arose under the 1917 act. The court there concluded that the alien, a convicted and admitted homosexual, came under the term "mentally defective" as also used in section 212(a)(4) of the 1952 act, and concluded that Congress did not intend to admit "a sex deviate so afflicted with such a defect of mentality as to publicly solicit an unnatural act." The concurring decision of Circuit Judge Frank quoted the Senate Report and the Public Health Service Report referred to above. "Psychiatrists have differing perspectives when they are (a) classifying patients, (b) diagnosing patients with reference to possible 'cure,' and (c) discussing the legal 'responsibility' of those accused of crime. A psychiatrist with one perspective may use a psychiatric term in a manner different from another psy-

414

chiatrist with another different perspective," said Judge Frank. He believed the 1917 act may not have included sex deviates, but there was no question in the minds of any of the Court that the 1952 act does include such persons.

The record shows that respondent is definitely within the class of "homosexuals," as the term is commonly understood, and within the contemplation of law. Within Dr. A——'s psychiatric parlance respondent may not be a true homosexual, but the record establishes that he is not a young boy, that he has been engaged in these activities for some years, on many occasions, and with many partners. This is not a case of a pseudohomosexual, as described by both specialists, who engaged in such activities because he found himself in unusual circumstances. If this man is not a homosexual, we would find it difficult to hold that anyone is a homosexual. Since Congress unquestionably intended to include homosexuals in the class of aliens afflicted with a psychopathic personality, we can make no finding except that respondent is subject to deportation under section 241(a)(1) of the Immigration and Nationality Act in that, at the time of entry, he was within a class of aliens excludable by the law existing at the time of such entry, to wit, an alien afflicted with a psychopathic personality under section 212(a)(4) of the Act.

Counsel's basis for his appeal with regard to the second charge is *Matter of J——*, 2 I. & N. Dec. 285, 287 (B.I.A., March 1, 1945; Sol. Gen., May 29, 1945). The *J——* case establishes the rules to be observed in finding that an alien has admitted the commission of a crime involving moral turpitude. Respondent made a binding admission under the rules of the *J——* case. The Solicitor General's restatement of the elements of a binding admission, 2 I. & N. Dec. 285 at 288, contains the repeated admonition that the admission must be "clear," but there is no provision in the formula that the elements of an admission must occur in any particular sequence. The alien was advised of the acts committed by him which were stated to constitute gross indecency and sodomy. Respondent clearly and repeatedly admitted the acts which constitute the essential elements of the crime. His admission was unequivocal.

There is no question that the crimes of gross indecency between male persons and sodomy are crimes involving moral turpitude by the language of the Michigan statutes, and the decisions of this Board, and under such court decisions as are available. As long ago as February 26, 1944, the Board held that a violation of section 338 of the Michigan Penal Code involves moral turpitude, as the offense of fellatio is comprehended within the definition of the statute (*Matter of S——*, unreported, 56152/594). The decision of the special inquiry officer cites *Matter of W——*, 5 I. & N. Dec. 578

415

(B.I.A., Dec. 23, 1953), wherein, on reconsideration, the Board found that a statement by an alien under oath to a Service officer that he had been a person of homosexual habits and that he had been addicted to practicing masturbation with other male persons was an unequivocal admission of the commission of the crime of gross indecency in violation of that section of the Michigan statute; that the element of moral turpitude was present; and that the alien was deportable on the basis of his competent and binding admission. Most recently, we decided in *Matter of H——* (Nov. 29, 1956, 7 I. & N. Dec. 359), that the offense of gross indecency in violation of section 206 of the Canadian Criminal Code, practically identical to the statute here under consideration, is a crime involving moral turpitude, citing cases. We considered similar statutes of other States where the acts were not defined by statute, or even set out in the record of conviction because of their obscenity and grossness, and we found that the absence of definition as to the nature of the crime in the Canadian statute did not prevent a conclusion that an admission of the commission of the crime involved moral turpitude when the conduct admitted by respondent was vile, depraved and contrary to the tenets of society. *Holdway* v. *Barber* (D.C., N.D. Calif., 1957), unreported, upheld our decision in *Matter of H——*, *supra*, agreeing that the conviction involved moral turpitude. A similar statute, wherein the offense is not defined, is considered in *Matter of Z——*, 7 I. & N. Dec. 253.

Following the lodging of the second charge the special inquiry officer granted an adjournment of the hearing for the purpose of permitting counsel and respondent to meet the lodged charge. At the reopened hearing, December 19, 1958, counsel asked respondent if he knew at the time he made the statement of June 19, 1958, what the terms "gross indecency" and "crime against nature" or "sodomy" were, and if he could have defined the meaning of these terms. The alien stated that he did not know what they meant at the time he made the statement and that he could not define the terms then nor now. He stated that he did not know what the special inquiry officer was talking about when he read the Michigan statutes relating to these offenses. At the time he made his statements of June 19, 1958, not only did the respondent answer the questions of the investigator, but when he was asked whether or not he had at any time engaged in acts of sodomy, and the investigator defined these acts for him, the alien volunteered, "I have done that to somebody but I never let them do it to me." The special inquiry officer concluded that from his observation of the respondent during the hearing, from respondent's demeanor and manner of response, the special inquiry officer believed him to be mentally alert, observant, and of sufficient understanding to com-

416

prehend the questions put to him, and found that respondent's testimony that he did not understand the investigator is unworthy of belief. Our reading of the record leads us to the same conclusion. It should be remembered that this alien is from Canada and does not have the handicap of dissimilarity of language that exists in many of these cases.

Counsel complains that respondent's statement is not used as evidence of an offense, but that the statement itself constitutes the very grounds for deportation. That is the effect of this peculiar provision of the immigration laws. The subsection providing for the "admission of the commission of a crime" was present in the 1907 act and was carried over into the 1910, 1917 and 1952 acts. (Senate Committee Report No. 1515, 81st Cong., 2d sess., p. 350.) The fact that an alien can make an admission which, in itself, renders him deportable, even though he may not have been convicted of the precise crime which he admits, may be unique and seem severe, but it has been part of the immigration statutes for many years. It is because of its severity that the rules of the J—— case, *supra*, were established and are adhered to.

We have sustained the use of preliminary statement given by the alien voluntarily in *Matter of P——*, 5 I. & N. Dec. 306; *Matter of F——*, 4 I. & N. Dec. 475; *Matter of P——*, 4 I. & N. Dec. 684, and decisions discussed therein. The present regulation, 8 CFR 242.14,[1] is the equivalent of the old regulations, 8 CFR 150 and 151, set forth in footnotes 1 and 2 to *Matter of F——*, 4 I. & N. Dec. 475. *Schoeps* v. *Carmichael*, 177 F.2d 391 (C.A. 9, 1949), held a recorded statement of an alien made under oath was admissible under the regulation, and referred to the regulation as "sensible." Exhibit 2 shows that respondent was informed that any information he gives should be voluntary, that it might be used by the Government in any proceeding that might be instituted against him. He was asked if he was willing to make such a statement. He was placed under oath and informed as to the meaning and penalties for perjury. These warnings and admonitions serve to preserve his constitutional rights. The failure to advise him of the right to counsel at the taking of a preliminary statement does not render the hearing unfair or invalidate the use of the statement. We find nothing in the record upon which to base a finding that his statement was not free and voluntary.

---

[1] 8 CFR 242.14:
(c) *Use of prior statements.* The special inquiry officer may receive in evidence any oral or written statement which is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial.

Lodging of the additional charge was proper within the regulations.[2]

It is our conclusion that respondent was given a fair hearing; that he is deportable on both the lodged charge and the charge set forth in the order to show cause; and that the appeal must be dismissed.

**Order:** It is ordered that the appeal of the alien be and is hereby dismissed.

*It is further ordered* that the appeal of the examining officer be sustained, and so much of the special inquiry officer's order as finds the alien not subject to deportation on the charge stated in the order to show cause be reversed, and the alien is found to be subject to deportation under section 241(a)(1) of the Immigration and Nationality Act, in that, at time of entry, he was an alien afflicted with psychopathic personality under section 212(a)(4) of the Act.

*It is further ordered* that the portion of the order of the special inquiry officer finding the alien deportable on the lodged charge be and is hereby approved.

---

[2] 8 CFR 242.16 (d) provides, in part:

(d) *Additional charges.* An examining officer who has been assigned to a case may at any time during a hearing lodge additional charges of deportability, including factual allegations against the respondent.